**EXHIBIT B**

Federal Communications Commission                                                                                          FCC 23-44

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | File No.: EB-TCD-21-00032652 |
| | ) | NAL/Acct. No.: 202132170001 |
| John M. Burkman | ) | FRN: 0031299985 |
| Jacob Alexander Wohl | ) | FRN: 0031300023 |
| J.M. Burkman & Associates LLC | ) | FRN: 0031300064 |

**FORFEITURE ORDER**

Adopted:  June 5, 2023                                                                                               Released:  June 6, 2023

By the Commission:

**TABLE OF CONTENTS**

Heading                                                                                                                                 Paragraph #

I.  INTRODUCTION ............................................................................................................................. 1
II. BACKGROUND ............................................................................................................................... 2
III. DISCUSSION ................................................................................................................................. 10
IV. ORDERING CLAUSES .................................................................................................................. 52

**I.      INTRODUCTION**

1. This Forfeiture Order advances the top consumer protection priority for the Federal Communications Commission (FCC or the Commission)[1]—combatting unlawful, unwanted telephone calls.  In doing so, it assesses a forfeiture of $5,134,500 against John M. Burkman (Burkman), Jacob Alexander Wohl (Wohl), and J.M. Burkman & Associates LLC (Burkman & Associates) (collectively, the Respondents) for making 1,141 unlawful robocalls.[2]  After evaluating the evidence, including Respondents' response, we find that Respondents made robocalls to wireless numbers without the recipients' prior express consent, absent an emergency purpose, in violation of the Telephone Consumer Protection Act (TCPA), as codified in section 227(b) of the Communications Act of 1934, as amended (Act), and section 64.1200(a)(1)(iii) of the Commission's rules.[3]

**II.     BACKGROUND**

2.          *Legal Framework.*  Under the Telephone Robocall Abuse Criminal Enforcement and Deterrence (TRACED) Act, the Commission may issue a Notice of Apparent Liability for Forfeiture for

---

[1] Federal Commc'ns Comm'n, *Consumer Guide: Stop Unwanted Robocalls and Texts* (Nov. 12, 2020), https://www.fcc.gov/sites/default/files/stop_unwanted_robocalls_and_texts.pdf (last visited Apr. 16, 2023).

[2] Burkman and Wohl each have pleaded guilty and were sentenced for one count of criminal telecommunications fraud in state court in Ohio and have also been found liable in a civil action in federal court for conduct related to making the calls at issue in this Forfeiture Order.  *See* Def.'s Tr. of Proceedings at 11, *Ohio v. Wohl*, Nos. CR-654013-A, 654013-B (Cuyahoga County Ct. Com. Pl., Oct. 24, 2022) (Burkman and Wohl each pleaded guilty to one count of telecommunications fraud for making robocalls in Cuyahoga County, Ohio, for which they were sentenced to 24 months of supervision, required to pay a $2,500 fine, and were ordered to work 500 hours of community service); *Nat'l Coal. on Black Civic Participation v. Wohl,* No. 1:20-cv-8668, 2023 WL 2403012, at *37 (S.D.N.Y. Mar. 8, 2023) (respondents found liable for violating the Voting Rights Act and Ku Klux Klan Act).

[3] *See* 47 U.S.C. § 227(b); 47 CFR § 64.1200(a)(1)(iii).

violations of section 227(b) of the Act without first issuing a citation.[4]  The TCPA and the Commission's implementing rules prohibit prerecorded voice calls to wireless telephone numbers without the recipients' prior express consent—unless made for an emergency purpose.[5]  The TCPA's restrictions on prerecorded calls to wireless numbers apply equally to telemarketing and informational calls.[6]  Making prerecorded calls to wireless numbers without the recipients' prior express consent is a violation of the TCPA regardless of the caller's intent.[7]

3. Liability under the TCPA attaches to the person(s) or entity(ies) that made the call.  To determine who made a robocall, the Commission looks to the totality of the facts and circumstances to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA.[8]

4. *Factual Background.*  On September 15, 2020, Enforcement Bureau (Bureau) learned about thousands of prerecorded voice message calls relating to upcoming elections.[9]  The Commission also received complaints about the calls.[10]  The Bureau confirmed the existence of the robocalling campaign and identified the two dialing platforms that dialed the prerecorded calls on behalf of Respondents.  The Bureau then issued subpoenas to these dialing platforms requesting call detail records, service agreements, and copies of the recordings.[11]

---

[4] 47 U.S.C. § 227(b)(4); Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, Pub. L. No. 116-105, § 3(a)(1); 133 Stat. 3274 (2019) (TRACED Act).

[5] 47 U.S.C. § 227(b)(1)(A)(iii); 47 CFR § 64.1200(a)(1)(iii); *see also Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335 (2020) (invalidating the debt collection exception in 47 U.S.C. § 227(b)(1)(A)(iii)).  The Commission has granted exemptions to the prior-express-consent requirement, relying on the exemption authority Congress provided in 47 U.S.C. § 227(b)(2)(C).  *See, e.g.*, 47 CFR § 64.1200(a)(9).  None of those narrow exemptions are applicable to the facts set forth in this Forfeiture Order.

[6] *See, e.g.*, 47 U.S.C. § 227(b)(1); 47 CFR § 64.1200(a); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd 1830, 1838-1844, paras. 20-34 (2012) (*2012 TCPA Order*); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991/Request of ACA International for Clarification and Declaratory Ruling*, 23 FCC Rcd 559, 565, para. 11 (2008) (*ACA Declaratory Ruling*).

[7] Section 3 of the TRACED Act removed the requirement that the Commission issue a citation, or warning, pursuant to section 503(b)(5) of the Act before the Commission may propose a monetary forfeiture under section 227(b).  *See* TRACED Act § 3(a)(1), 133 Stat. at 3274 (adding 47 U.S.C. § 227(b)(4)(A)).

[8] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, et al., Declaratory Ruling and Order, 30 FCC Rcd 7961, 7980, paras. 29-30 (2015) (*2015 Declaratory Ruling and Order*)

[9] This information originated from The Lawyers' Committee For Civil Rights Under Law (Lawyers' Committee).  *See* E-mail from {[                                                            ]}, to Raul Rojo, Attorney Advisor, Federal Communications Commission (Sept. 24, 2022, 02:19:21 PM EST) (on file in EB-TCD-21-00032652).  The Lawyers' Committee is a nonprofit organization whose principal mission is to, "secure equal justice for all through the rule of law, targeting in particular the inequities confronting African Americans and other racial and ethnic minorities."  Lawyers' Committee, Mission, https://lawyerscommittee.org/mission (last visited July 18, 2022).  Material set off by double brackets {[  ]} is confidential and is redacted from the public version of this document.

[10] *See* Complaint #4182753; *see also* Complaint #4183268 (on File No. EB-TCD-21-00032652).

[11] *See* {[               ]} Subpoena Response (Mar. 5, 2021) (on file in EB-TCD-21-00032652 (Gravis Subpoena Response)); {[                    ]} *see also* Subpoena Response to Ohio Attorney General's Office (on file in EB-TCD-21-00032652).

5.      The Bureau listened to the call recordings to confirm that they were prerecorded message calls.[12]  The messages told potential voters that if they voted by mail, their "personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts."[13]  The recorded messages identified Burkman and Wohl by name and claimed to be made by "Project-1599," a fictitious organization run by Respondents.[14]

6.      The subpoena responses also provided call detail records for every call that the providers dialed on behalf of Burkman and Wohl.[15]  The Bureau analyzed the call detail records using industry-standard, commercially available software, and a database of known assigned wireless numbers to determine whether any of the robocalls went to wireless phones.  It was determined that 1,141 calls were made to wireless telephones.

7.      The subpoena responses produced records of e-mail exchanges between Burkman and Wohl and a representative of the dialing platform.  In the e-mails, Respondents discussed the voice messages, which zip codes to call, pricing, and other matters related to the robocalling campaign.[16]  These e-mail exchanges demonstrated Respondents' intimate knowledge of and involvement with the robocalling campaign.[17]

8.      The Bureau called each of the consumers assigned to the wireless phone numbers to (a) confirm that they were assigned the numbers during the relevant time period, and (b) determine whether the consumer had consented to receiving the calls.[18]  Two of those consumers were interviewed by the Bureau and confirmed that they had not given consent to receive the calls and had not heard of Burkman, Wohl, or Burkman & Associates prior to receiving the robocalls.[19]  Further, Respondents have not provided the Bureau with evidence of consent for any of the 1,141 calls to wireless numbers at issue in this Notice.

9.      On August 24, 2021, the Commission issued a Notice of Apparent Liability (*Notice*), proposing a $5,134,500 penalty for violations of the Act and section 64.1200(a)(1)(iii) of the

---

[12] 788 wireless calls were made on August 26, 2020, and 353 wireless calls were made on September 14, 2020, for a total of 1,141 calls to wireless numbers.  Bureau staff listened to samples of the recorded calls, each of which was consistent with a previously recorded audio message.  *See* Call Detail Records (on file in EB-TCD-21-00032652).

[13] *See* Call Transcripts (on file No. EB-TCD-21-00032652).  The full recording stated:

> Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl.  Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts?  The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines.  Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail.

*Id.*  While we provide details of the transcript for purposes of the Background, we reiterate that the content of the calls is not relevant to our determination under the TCPA and the Commission's rules.  *See supra* para. 2; *see also Kenneth Moser dba Marketing Support Systems*, Forfeiture Order, 35 FCC Rcd 13415, 13432, paras. 37-38 (2020) (*Moser Forfeiture Order*) (rejecting the assertion, in the illegal spoofing context, that the Commission's action "was based on the content of the prerecorded message").

[14] The recordings themselves refer to Project-1599 as "the civil rights organization founded by Jack Burkman and Jacob Wohl."  *See* Robocall Audio File (on file in EB-TCD-21-00032652).

[15] *See* Call Detail Records (on File No. EB-TCD-21-00032652).

[16] *See* E-mail Records (on file in EB-TCD-21-00032652).

[17] *2015 Declaratory Ruling and Order*, *supra* note 8, at para. 30.

[18] *See* {[■■■■■■■■■■]} Decl. (on file in No. EB-TCD-21-00032652).

[19] *See id.* at para. 19.

Commission's rules. On September 23, 2021, Respondents submitted a response (*Burkman Response* or *Response*) to the *Notice*.[20] We address the substantive arguments below.

### III.    DISCUSSION

10.    *The Robocalls Violated the TCPA.*  Respondents made 1,141 unlawful robocalls to wireless numbers in violation of the TCPA and Commission rules.  A review of sample recordings determined that the calls were prerecorded messages.  E-mail communications between a dialing platform and Burkman further demonstrate that the calls were prerecorded messages.[21]  Respondents do not contest that the calls contained prerecorded messages.  Respondents do not claim that they had prior express consent to place the calls, nor do they allege that the calls were made for an emergency purpose.

11.    As a threshold matter, Respondents state that "the robocalls attributed to Respondents were exempt, facially permissible, and legally compliant political calls."[22]  Respondents suggest that the Commission should have "prosecuted the entities responsible for the alleged TCPA violation: the dialing platforms."[23]  However, the TCPA does not differentiate among callers; it applies to anyone who makes an unlawful robocall.[24]  As set forth below, Respondents made the calls and had the burden to obtain consent for each call.[25]  Respondents did not provide evidence that they or the dialing platform had consent for any of the calls.

12.    *Respondents Made the Robocalls.*  Respondents assert that they did not make the robocalls at issue and are therefore not liable under the TCPA.  The TCPA, however, states that it is unlawful—

> . . . . for any person . . . to *make any call* . . . using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.[26]

13.    Respondents offer several arguments to support their claim that they did not make the calls.  *First*, Respondents assert that the *Notice* relied on a case, *Dish Network,* that Respondents claim is inapt because it addressed a different provision of the TCPA and a different implementing regulation than the ones at issue here.[27]  Respondents claim that the TCPA provision at issue in this case, section 227(b)(1)(A)(iii), uses the word "make" and does not include the word "initiate."  Thus, Respondents

---

[20] *See Response of John M. Burkman, Jacob Alexander Wohl, and J.M. Burkman & Associates LLC to Notice of Apparent Liability for Forfeiture* (Sept. 23, 2021) (on file in EB-TCD-21-00032652) (hereinafter *Burkman Response*).

[21] *See* E-mail Records (on file in EB-TCD-21-00032652).

[22] *See Burkman Response* at 44.

[23] *See id.* at 44 (asserting that the Commission should have "prosecuted the entities responsible for the alleged TCPA violation: the dialing platforms").

[24] 47 U.S.C. § 227(b)(1)(A)(iii) (it is unlawful "***for any person*** . . . to make any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." (emphasis added)).

[25] *See Dialing Services LLC*, Forfeiture Order, 32 FCC Rcd 6192, 6200, para. 23 (2017) (*Dialing Services Forfeiture Order); Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559, 565, para. 10 (2008) (concluding that "[s]hould a question arise as to whether express consent was provided, the burden will be on [the caller] to show it obtained the necessary prior express consent") (*2008 TCPA Order*).

[26] *See* 47 U.S.C. § 227(b)(1)(A)(iii).

[27] *See Burkman Response*, *supra* note 20, at 16; *Joint Petition filed by DISH Network LLC*, Declaratory Ruling, 28 FCC Rcd 6574 (2013) (*Dish Declaratory Ruling*).

4

argue the Commission's *Notice* improperly relied on the *Dish Network* decision for its apparent finding that Respondents were liable under the TCPA because they *initiated* the robocalls. Respondents state that they are only liable if they *made* the calls at issue, which they claim not to have done.

14. We find Respondents' argument unpersuasive. The Commission has used the words "make" and "initiate" interchangeably to describe the same conduct and does not draw any distinction between the two.[28] "The same logic that applies to the 'initiation' of calls under section 227(b)(1)(b) applies to the 'making' of calls under section 227(b)(1)(A)."[29] Thus, Respondents' argument fails because there is no relevant distinction between the terms "make" and "initiate." The Commission has determined that for the purposes of interpreting the TCPA, the words "initiate" and "make" have broad and overlapping meanings so as to be synonyms.[30] Moreover, the Commission has previously found that a person "makes" or "initiates" a call when there is a "direct connection between a person or entity and the making of a call."[31] We therefore reject Respondents' argument that we improperly relied on section 227(b)(1)(B), and that we cannot use precedent to help determine who makes a call.

15. *Second*, Respondents argue that they did not make the robocalls because they did not physically dial the numbers.[32] In our *2015 Declaratory Ruling and Order*, the Commission clarified that a caller may be found to have made or initiated a call in one of two ways: first, by "tak[ing] the steps necessary to physically place a telephone call," and, second, by being "so involved in the placing of a specific telephone call as to be directly liable for making it." To determine whether a party is "so involved," the Commission considers "the totality of the facts and circumstances surrounding the placing of a particular call."[33] Thus, the fact that the Respondents did not physically make the call is not dispositive. As discussed below, Respondents were indeed so involved as to be deemed to have initiated the calls.

16. Respondents argue that section 227(b) "only imposes liability upon persons that 'make' a telephone call or text," and that the *Notice* used a "nebulous methodology" to interpret what it means to "initiate" or "make" a call.[34] The Commission's methodology is not nebulous. As discussed above, the Commission uses a totality of the circumstances test to determine who is the maker of an unlawful call.

17. The Response notes that the Commission cited the *2015 FCC order*, which cites to the analysis in *Dish*. Respondents argue that the analysis in *Dish* was directed at the interpretation of the word "initiate" in a different provision of the TCPA, section 227(b)(1)(B), which they claim only addresses the liability of "sellers," and is therefore not applicable in this case.[35] Section 227(b)(1)(B) is not relevant here. As discussed above, the Commission has found that the same language concerning who

---

[28] 47 CFR § 64.1200(a)(1); *compare* 47 U.S.C. § 227(b)(1)(A), *with* 47 CFR § 64.1200(a)(1); *see also Dialing Services, LLC*, Notice of Apparently Liability for Forfeiture, 29 FCC Rcd 5537, 5542, para 14, n.30 (2014) (*Dialing Services NAL*) ("The Commission uses the words 'make' and 'initiate' interchangeably in its rules arising under § 227(b)(1)(A) without drawing any distinction.").

[29] *2015 Declaratory Ruling and Order*, 30 FCC Rcd at 7979, para. 27 n.95 (stating "[w]hile DISH Declaratory Ruling interpreted and applied section 227(b)(1)(B), the Commission has recently stated that the same logic that applies to the 'initiation' of calls under section 227(b)(1)(b) applies to the "making" of calls under section 227(b)(1)(A)").

[30] *Id.*

[31] *See Dialing Services NAL*, 29 FCC Rcd at 5543, para. 16 (quoting *Dish Declaratory Ruling*, 28 FCC Rcd at 6583, para. 26, and applying the language to section 227(b)(1)(A)).

[32] *Burkman Response* at 14-17.

[33] *2015 Declaratory Ruling and Order*, *supra* note 8, at para. 30.

[34] *See Burkman Response*, *supra* note 20, at 15.

[35] *Id*. at 19.

may be considered the "maker" of a call applies to both telemarketing and non-telemarketing calls.[36] Accordingly, the standard for determining whether a party may be deemed to have made the call applies to the present case, where the Commission found that Respondents violated section 227(b)(1)(A)(iii), which does not limit liability to "sellers."[37]

18.     *Third,* Respondents argue that they could not be deemed to have made the calls because they did not have "control over the manner and means of the calls" and had no right to control how the calls were made.[38] The undisputed evidence, however, shows that Respondents were integrally involved in all facets of the robocall campaign. In e-mail exchanges with a dialing platform, Respondents provided the dialing platform with the audio recordings that they desired to use.[39] A dialing platform representative provided Burkman with instructions on how to upload and save the audio files.[40] Burkman also provided the dialing platform with zip codes and selected the timing and number of calls that would be made.[41]

19.     Respondents do not dispute that they contracted with the dialing platform and directed that the calls be made to certain zip codes.[42] Respondents also acknowledge that they created the recordings and instructed the dialing platforms to play the recorded messages with each call.[43] Respondents contend that there is "no evidence demonstrating that the dialing platforms could not have mounted the calls without Burkman and Wohl having provided their names and/or a telephone number."[44] The Commission is not required to prove that the dialing platform *could not* have placed the unlawful calls without Respondents' involvement: only that Respondents were so involved that they may reasonably be deemed to have made them. When a person selects the message and is sufficiently involved in determining who will receive the calls, then it follows that they make the call and are liable under section 227(b)(1)(B) of the TCPA.[45]

20.     On October 26, 2020, during a hearing in the United States District Court for the Southern District of New York, Respondents admitted that both Burkman and Wohl "prepared th[e] message" and "caused it to be sent:"

---

[36] 47 CFR § 64.1200(a)(1); *compare* 47 U.S.C. § 227(b)(1)(A), *with* 47 CFR § 64.1200(a)(1); *see also Dialing Services NAL*, *supra* note 28, at para 14. ("The Commission uses the words 'make' and 'initiate' interchangeably in its rules arising under § 227(b)(1)(A) without drawing any distinction.").

[37] 47 U.S.C. § 227(b)(1)(A)(iii); *John M. Burkman, Jacob Alexander Wohl, J.M. Burkman & Assocs. LLC,* Notice of Apparently Liability for Forfeiture, 36 FCC Rcd 12979, 12988 (2021) (*Notice*).

[38] *See Burkman Response, supra* note 20, at 22.

[39] *See* e-mail from Jacob Wohl, to {[                                                              ]} (Sept. 8, 2020, 17:45 EST) (on file in EB-TCD-21-00032652) ("Heres [sic] the tape we want to go out.").

[40] *See* Account Setup Call (on file in EB-TCD-21-00032652); *see also* e-mail from Jacob Wohl, to {[         ]}(Sept. 10, 2020 01:14 EST) ("Let's launch Monday Sep 14, 2020. Heres [sic] the tape we want to go out.").

[41] *Id.* at 60 ("can i [sic] email you the credit card? i [sic] want to target these zip codes . . . .").

[42] *See* Gravis Subpoena Response (Mar. 5, 2021) (on File No. EB-TCD-21-00032652); *see also* Service Agreements (on file in EB-TCD-21-00032652). The dialing platform identified Burkman and Wohl as the individuals responsible for the account from which the calls originated and provided service agreements showing Burkman as the account holder. These service agreements listed Burkman's personal phone number, e-mail, and residential address. Bureau staff confirmed that the address, phone number, and e-mail listed on the service agreements were in fact Burkman's.

[43] *See Burkman Response*, *supra* note 20, at 27-29; *see also id.* at 29 (stating "the existence of a contract between Respondents and the respective dialing platforms—even one that imposes certain constraints on the platforms—does not necessarily mean that Respondents had the power to give 'interim instructions' to the platforms").

[44] *Id.* at 27.

[45] *2015 Declaratory Ruling and Order*, *supra* note 8, at para. 30.

> The Court: My question was whether you, acting alone or with anyone else, prepared that message and caused it to be sent?
>
> Mr. Burkman: Oh, yes, your Honor, yes. That is our call, yes, yes.
>
> The Court: Mr. Wohl, you indicated that you echo all of what Mr. Burkman said. Does that include acknowledgement that you participated in the preparation of the content of the message and its communication to plaintiffs through the entity in California?
>
> Mr. Wohl: Yes, your Honor, as to Mr. Burkman's specific representation, yes, yes.[46]

21. Respondents argue that the statements were not made under oath and Respondents did not have counsel present.[47] Neither of these conditions preclude the Commission from considering these statements in this proceeding. Respondents' statements were not made and are not being used as evidence in a criminal trial, but as just one of several pieces of evidence that together indicate the Respondents took an active part in, and claimed responsibility for, making the robocalls. Respondents made these statements in an open court hearing before a federal judge; the Respondents have not disavowed their veracity.

22. *The Applicable TCPA Prohibitions Apply to the Respondents' Calls.* Respondents argue that the TCPA is inapplicable because the Respondents were not "sellers," and the dialing platforms were not "telemarketers" engaged in telemarketing.[48] While this claim applies to one provision of the TCPA (which prohibits unconsented calls to "any residential telephone line"), the NAL did not allege that Respondents violated that statutory provision. Instead, the NAL alleged that the Respondents violated a separate TCPA provision, which prohibits unconsented to calls to wireless numbers.[49] More specifically, that section of the TCPA prohibits:

> any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.[50]

This statutory prohibition applies to robocalls regardless of whether the calls included telemarketing messages and regardless of the nature of the caller.

23. Respondents also argue that the TCPA was not intended to restrict political calls.[51] We reject the assertion that the TCPA applies only to commercial activities. As the Commission has previously stated, the mere fact that a calling campaign is political in nature does not protect the caller from liability under Commission rules.[52] "The placement of illegal robocalls causes consumers

---

[46] *See National Coalition on Black Civic Participation et al. v. Wohl et al.*, No. 1:2020cv08668, ECF No. 53 at 12 (S.D.N.Y. Oct. 26, 2020).

[47] *Id.* at 28.

[48] *Burkman Response*, *supra* note 20, at 19.

[49] *Notice*, *supra* note 37, at para 11.

[50] *See* 47 U.S.C. § 227(b)(1)(A)(iii).

[51] *Burkman Response*, *supra* note 20, at 38-39.

[52] *See Warning Political Campaigns and Promoters Against Robocall Abuse*, Enforcement Advisory, Public Notice, 29 FCC Rcd 12657 (EB 2014); Political Campaigns and Promoters are Reminded of Restrictions on Autodialed and Prerecorded Calls, Enforcement Advisory, Public Notice, 27 FCC Rcd 11017 (EB 2012). Political calls made to residential telephone lines may be legal provided certain conditions are met; for this reason the *Notice* concerned only calls made to wireless telephone numbers. *See* 47 U.S.C. § 227(b)(2)(B); 47 CFR § 64.1200(a)(2)-(3).

significant harm, including that such calls are a nuisance and [an] invasion of privacy."[53]  There is no indication that Congress intended to exclude calls that contain political content.  The Commission has previously found violations of the TCPA in other instances where the calls pertained to political campaigns.[54]

24.     *The Commission's Process Was Lawful*.  Respondents allege that the Commission acted improperly by not first issuing a citation.[55]  Respondents further suggest that this alleged lack of notice is particularly inappropriate because the calls were political calls rather than telemarketing calls.  Congress eliminated the obligation to first issue a citation before proposing a fine for TCPA violations in 2019.[56]  It did not distinguish between telemarketing and other types of calls when doing so.[57]  The Commission followed the procedures set out in the Act and its rules.[58]  Respondents acknowledge that the TRACED Act amended subsection 227(b)(4)(A) to remove the citation requirement in subsection 503(b)(5).[59]  Further, the TCPA and our implementing rules identify the elements of a robocall violation, including the standard by which a case will be brought.  This did not change in 2019 with the amendment to section 227(b)(4)(A).  Additionally, the TCPA and Commission rules specify the maximum potential forfeiture and are clear that the penalties apply on a per violation basis.  Thus, the TCPA and Commission rules make the violation and potential forfeitures reasonably ascertainable to the public.[60]

25.     The Commission used the same methodology in prior robocall cases which further supports the lawfulness of the Commission's process.[61]  First, the Bureau was alerted to suspected unlawful robocalls.[62]  Then the Bureau issued subpoenas and worked with industry partners and fellow law enforcement agencies to identify the source of the calls.  The Bureau reviewed subpoena responses and listened to sample recordings of the calls to verify that they were all prerecorded.[63]  Call detail

---

[53] *See Philip Roesel, dba Wilmington Insurance Quotes*, Forfeiture Order, 33 FCC Rcd 9204, 9217-18, paras. 38-40 (2018) (*Roesel Forfeiture Order*); *see also* Pub. L. No. 102-243 (1991); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752 (1992) (*1992 TCPA Order*).  *Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek*, Forfeiture Order, 36 FCC Rcd 705, 729, para. 55 (2021) (*Rhodes Forfeiture Order*)

[54] *See, e.g.*, *Moser Forfeiture Order*, *supra* note 13, at 13, para. 24; *Rhodes Forfeiture Order*, 36 Rcd at 729, para.19 (2021); *see also Barr v. Am. Assoc. of Political Consultants, Inc.*, 140 S. Ct. 2335, 2344 (2020) ("[P]laintiffs still may not make political robocalls to cell phones [under the TCPA].").

[55] *See Burkman Response*, *supra* note 20, at vii, 11, 37.

[56] Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, Pub. L. No. 116-105, § 3(a)(1), 133 Stat. 3274, 3274-75 (2019).

[57] *Id*.

[58] *See* TRACED Act § 3(a)(1), 133 Stat. at 3274 (amending 47 U.S.C. § 227(b)(4)(A) by adding a sentence stating: "Paragraph (5) of section 503(b) shall not apply in the case of a violation of this subsection.").

[59] *Id.*

[60] *See, e.g.*, *Star Wireless, LLC v. FCC*, 522 F.3d 469, 473-74 (D.C. Cir. 2008) (finding the regulation and other public statements of the FCC provided the "regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform").

[61] The Bureau used the same techniques and investigative processes that it has used in all of its recent robocall enforcement cases.  *See e.g.*, *Roesel Forfeiture Order*, *supra* note 54, at 9218-19, para. 40; *Moser Forfeiture Order*, *supra* note 13, at 13430, para. 33; *John C. Spiller; Jakob A. Mears; Rising Eagle Capital Group LLC; JSquared Telecom LLC; Only Web Leads LLC; Rising Phoenix Group; Rising Phoenix Holdings; RPG Leads; and Rising Eagle Capital Group – Cayman*, Notice of Apparent Liability for Forfeiture, 35 FCC Rcd 5948, 5948 (2020).

[62] See E-mail from {[                                      ]}, to Raul Rojo, Attorney Advisor, Federal Communications Commission (Sept. 24, 2022, 02:19:21 PM EST) (on file in EB-TCD-21-00032652).

[63] *See* Gravis Subpoena Response (Mar. 5, 2021) (on File No. EB-TCD-21-00032652).

records were then examined to identify each call's date, time, and duration.  The Bureau analyzed the call detail records with industry-standard, commercially available software and database of known assigned wireless numbers to determine whether they were made to wireless numbers.[64]  This process identified 1,141 calls to wireless numbers.  Finally, the Bureau spoke to consumers who later provided signed declarations attesting to facts that support the finding of these violations.

　　　　　26.　　Respondents fail to provide any arguments or evidence supporting the insufficiency of the Commission's investigation.  Respondents say it is "striking that the Commission only successfully contacted *two* individuals who supposedly did not consent . . ." and "[n]otably, the Commission conceded that most of the purported universe of phone numbers" refused to answer the Commission's calls.[65]  Yet Respondents do not allege that these facts had any cognizable relevance as to whether they possessed the actual consent of the called parties to receive their robocalls.  They never assert that *any* of the consumers who received their robocalls gave them prior express consent as required by law, nor make any claim that the two recipients were atypical in some respect.  In fact, Respondents offered no evidence of consent whatsoever.  Respondents have the burden to prove that they have consent for each call they make.[66]  Meanwhile, the two affected consumers with whom the Bureau spoke stated unequivocally that they did not consent to receive Burkman and Wohl's robocalls, and each consumer provided a supporting declaration attesting to that fact.  We find the declarations supplied by the Respondents' victims far more persuasive than the Respondents' non-denial denials of their lack of consent.

　　　　　27.　　*The Forfeiture Amount Is Appropriate.*  The Commission proposed a forfeiture in accordance with section 503(b) of the Act,[67] section 1.80 of the Commission's rules,[68] and the Commission's *Forfeiture Policy Statement*.[69]  When we assess forfeitures, subsection 503(b)(2)(E) of the Act requires that we take into account the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[70]  Nevertheless, Respondents make several arguments that the *Notice's* proposed forfeiture amount is unlawful, excessive, and arbitrary.  Respondents dispute that their conduct was willful or repeated.  As a preliminary matter, although Respondents assert that they did not make the calls, they do not question that whoever made the calls did so in violation of the TCPA.

　　　　　28.　　Respondents claim that any calls placed to wireless numbers without consent represent only a "mere unintentional and incidental violation,"[71] and that such a "de minimis number cannot reasonably support a $5.1 million penalty under the circumstances, and which wholly undermines any

---

[64] *See* Call Detail Records (on file in EB-TCD-21-00032652).

[65] *Burkman Response*, *supra* note 20, at 38.

[66] *See Dialing Services Forfeiture Order*, *supra* note 25, at 6200, para. 23 ("[I]t is well-settled that '[c]allers contending that they have the prior express consent to make prerecorded voice or autodialed calls to cell phones or other mobile service numbers have the burden of proof to show that they obtained such consent.").

[67] 47 U.S.C. § 503(b).

[68] 47 CFR § 1.80.

[69] *Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, 12 FCC Rcd 17087 (1997) (*Forfeiture Policy Statement*), *recon. denied*, 15 FCC Rcd 303 (1999); *see* 47 U.S.C. § 503(b)(2)(D); 47 CFR § 1.80(b)(9); *see also Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation*, Order, 35 FCC Rcd 14879 (EB 2020) (adjusting amounts for inflation) (*Amendment of Section 1.80(b)*).

[70] 47 U.S.C. § 503(b)(2)(E).

[71] *Burkman Response*, *supra* note 20, at vi.

9

allegation that Respondents' alleged conduct was willful."[72]  Respondents misconstrue the meaning of willful.

29. The term "willful" is a defined term in the TCPA and means the "conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this Act or any rule or regulation of the Commission . . . ."[73]  The Commission is not required to show that the violations were intentional.[74]  Moreover, we find no mitigating evidence that would warrant a reduction in the forfeiture amount.  The evidence shows that Respondents had an opportunity to exclude wireless phone numbers from the call lists but declined to do so.  The dialing platform sent Burkman a link to a screenshot that included an option to eliminate calls to wireless numbers.[75]  Burkman could have selected this option yet did not do so.[76]  Even if Respondents did not intend to target wireless phone numbers, they offered no evidence of any effort to prevent calls to wireless numbers.

30. Respondents argue that they met other statutory requirements, such as "identifying the entity commissioning the call, and providing a telephone number . . ." to demonstrate their efforts to comply with the TCPA.[77]  We find that these efforts do not negate the illegality of calling wireless numbers without consent and do not warrant a reduction in the forfeiture amount.

31. Respondents note that a substantial portion of the robocalls were "drop off" calls that were not answered, and that many of the answered calls lasted less than 35 seconds.[78]  Respondents assert that because only about half of the calls could have been "completed" (according to Respondents' definition of that term), the forfeiture amount is excessive and unreasonable.[79]  The Commission has made it clear that a violation occurs whenever a call is made, regardless of whether it is answered.[80]

32. Robocalls cause harm and disruption even if the consumer does not pick up the phone.[81]  Robocalls have become so prolific that many consumers now refuse to pick up calls from numbers they

---

[72] *Id.* ("Moreover, the alleged calls at issue amount to a total of 1.3% of all the robocalls allegedly made, constituting a total of 1,141 calls. This de minimis number cannot reasonably support a $5.1 million penalty under the circumstances, which wholly undermines any allegation that Respondents' alleged conduct was willful.")

[73] 47 U.S.C. §§ 312, 501-503; 47 CFR § 1.80(a); *see also* 47 U.S.C. § 312(f)(1) (The Commission has found that "[T]he term "willful," when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this Act or any rule or regulation of the Commission authorized by this Act or by a treaty ratified by the United States.").

[74] *Compare* 47 U.S.C. § 227(b)(4)(A), *with* 47 U.S.C. § 227(b)(4)(B).

[75] Recording Transcript of Ohio Attorney General's Office (OAG) Investigator John Isaacs (on file in EB-TCD-21-00032652).

[76] *See* Screen Capture of Account Dashboard (on file in EB-TCD-21-00032652).

[77] *Burkman Response*, *supra* note 20, at 8, 32.  This statement further supports our finding that Respondents directed (commissioned) the dialing platforms to make the calls.

[78] *See id.* at 39-40.

[79] *Id.* at 39.

[80] *See Rules And Regulations Implementing The Telephone Consumer Protection Act Of 1991 Petition For Declaratory Ruling Of All About The Message, LLC*, Declaratory Ruling, FCC 22-85, 2022 WL 17225556, at *2, note 29 (CGB Nov. 21 2022); *see also Fillichio v. M.R.S. Associates, Inc.*, 2010 WL 4261442, at *3 (S.D. Fla. 2010) (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) and observing that the prohibition in the TCPA applies to phone calls placed to cellular telephone numbers even if the called party does not answer the calls).

[81] *See Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, 33 FCC Rcd 1024, 1026, para. 4 (footnote omitted) (2018) (2018 Report and Order) (stating that "even when consumers do not answer [robocalls], they incur the costs of interruption, disruption, lost productivity, and emotional upheaval.")

do not recognize. But even a call that a consumer elects not to answer is no less disruptive; the phone still rings; the consumer's attention is still required; the recipient still must view the incoming call to make a decision whether to answer; and then the recipient is left with the dissatisfaction of having had to deal with yet another untrustworthy call. The harm to telephone networks by illegal robocalls remains no matter what the final outcome of the attempted communication. Illegal robocalls place significant wasteful burdens on the telecommunications infrastructure regardless of whether the call is answered. Voice service providers must spend significant amounts of capital building out capacity for phone calls that end users do not want to receive.

33. Respondents argue that "each day that a violation occurred should be viewed as a *single* violation of the Rule permitting the agency to impose, at most, a $20,731 per day forfeiture penalty."[82] That proposal is inconsistent with the language of the statute and with all prior precedent. In cases involving violations of the TCPA and the Truth in Caller ID Act,[83] the Commission has uniformly treated each unlawful call as a distinct violation.[84] Although Respondents ignore this fact with respect to TCPA violations, they assert that the Truth in Caller ID Act cases are "in no way analogous" because spoofing requires "an intent to violate the statute."[85] We disagree. The salient factor is that each call that is in violation of the TCPA or the Truth in Caller ID Act is a distinct, actionable violation. In addition, assessing a fine based on the number of days, rather than the number of calls, would not adequately account for the harm that large-scale robocalling campaigns cause to consumers, service providers, and others. Technology provides robocallers with the ability to make thousands or millions of calls a day; they would be subject to nominal fines if they confined their calls to a small number of days. Such an interpretation would require upending thirty years of TCPA precedent and more than a decade of Truth in Caller ID precedent.

34. Respondents say it is "noteworthy" that the Commission used Interactive Marketing Solutions (IMS) to determine which calls went to wireless numbers "but does not state that private dialing platforms are mandated to use IMS software . . . ."[86] Respondents seem to argue that they should not be punished because their dialing platforms did not use IMS software to distinguish, and exclude, wireless phone numbers. The Commission's reference to IMS was merely to explain how it conducted its analysis and determined which calls were sent to wireless numbers. Respondents do not contest that this methodology was unfair or led to inaccurate results.[87] And the Commission is not imposing the fine based on failure to use a particular software. But the fact that the dialing platforms *might* have used

---

[82] *Burkman Response*, *supra* note 20, at 33 ("to the extent that the alleged robocalls were found not to satisfy the TCPA requirements, and in the absence of any citation requirement, each day that a violation occurred should be viewed as a *single* violation of the Rule permitting the agency to impose, at most, a $20,731 per day forfeiture penalty—and not the $5.1 million forfeiture proposed in the NAL.").

[83] 47 U.S.C. § 227(e); *see also* 47 CFR § 64.1604.

[84] *See, e.g.*, *Security First of Alabama*, Notice of Apparently Liability for Forfeiture, 26 FCC Rcd 6490, 6492-93, paras. 7-8 (2011) (proposing a base amount of $4,500 per unlawful call for 16 calls and a higher amount of $10,000 per call for 27 egregious violations, for a total of $342,000 for a total of 43 unlawful calls), forfeiture issued, *Security First of Alabama*, Forfeiture Order, 30 FCC Rcd 2377 (2015) (imposing proposed forfeiture); *1 Home Lending Corp.*, Notice of Apparently Liability for Forfeiture, 21 FCC Rcd 11852, 11856, para. 10 (2006) (proposing a forfeiture of $18,000 for four apparent violations of the TCPA ($4,500 per call), forfeiture issued, *1 Home Lending Corp.*, Forfeiture Order, 24 FCC Rcd 2888 (2009) (imposing proposed forfeiture).

[85] *Burkman Response*, *supra* note 20, at 34. We note that this statement demonstrates Respondents' recognition that the TCPA (unlike the Truth in Caller ID Act) does not require a finding of intent.

[86] *Id.* at 6, 41.

[87] In addition to using IMS, Bureau staff individually checked a sample of numbers, and each proved to be a wireless number. Respondents were provided with the call detail records acquired by the Bureau and had the opportunity to dispute that the calls were made to wireless numbers.

11

inadequate software (or no software at all) to distinguish wireless numbers does not absolve Respondents of their obligation to comply with the TCPA.[88]

35.     Section 503(b) of the Act authorizes the Commission to impose a forfeiture against any entity that "willfully or repeatedly fail[s] to comply with any of the provisions of [the Act] or of any rule, regulation, or order issued by the Commission."[89]  Section 503(b)(2)(D) authorizes the Commission to assess a forfeiture of up to $20,731 for each violation.[90]  In addition, the Commission has established forfeiture guidelines that establish base penalties for certain violations and identify criteria that we consider when determining the appropriate penalty in any given case.[91]  None of Respondents' arguments persuade us that the forfeiture is excessive or that mitigating factors warrant a reduction.

36.     *The Commission Provided The Requisite Notice*.  Respondents argue that, because this is the first time that the Commission has relied on the TRACED Act amendment to the TCPA that eliminates the requirement to issue a citation before proposing a monetary forfeiture, the amount is excessive.[92]  We disagree.  Congress did not direct or authorize the Commission to implement a transition period for eliminating the citation requirement.  In any case, the TRACED Act was in effect for more than six months when Respondents made the calls at issue, and the underlying prohibition against prerecorded messages to wireless phones had been in effect for years.[93]

37.     Respondents also claim that they had no basis for knowing that the Commission would impose "staggering penalties" and that it is doing so "for the first time in FCC history."[94]  But as set forth in the *Notice*, the Commission has on multiple occasions used a base forfeiture of $4,500 for violations of section 227(b).[95]  We find those cases analogous and follow them here.  Although most of the previous decisions involved a smaller number of calls than the number of apparently unlawful calls that Respondents made, we do not find this is a basis to deviate from the precedent, for several reasons.

38.     *First*, the Commission began imposing $4,500 per call forfeitures for unlawful robocalls at least as early as 2006.  At that time, the maximum allowable forfeiture was $11,000.[96]  The maximum

---

[88] Respondents also note that some numbers might have been landline numbers that have been ported to wireless phones.  *See Burkman Response*, *supra* note 20, at 6.  But Respondents did not provide any evidence that this was the case with respect to any of the 1,141 calls at issue.

[89] 47 U.S.C. § 503(b).

[90] *See* 47 U.S.C. § 503(b)(2)(D); 47 CFR § 1.80(b)(9); *see also Amendment of Section 1.80(b)*, 35 FCC Rcd 14879 (EB 2020) (adjusting amounts for inflation).

[91] *See* 47 CFR § 1.80(b)(10), note to paragraph (b)(10).

[92] *Burkman Response*, *supra* note 20, at 33.

[93] TRACED Act, *supra* note 4 (the TRACED Act went into effect on December 30, 2019).

[94] *Id.* at 34; *see also, id.* at 35 ("Commission's approach makes it impossible to anticipate the sanction for violating its rules.")

[95] *See e.g.*, *1 Home Lending Corp.,* Notice of Apparently Liability, 21 FCC Rcd 11852 (2006) (proposing a forfeiture of $18,000 for four apparent violations of the TCPA ($4,500 per call)), *1 Home Lending Corp.*, Forfeiture Order, 24 FCC Rcd 2888 (2009) (imposing proposed forfeiture); *Security First of Alabama,* Notice of Apparently Liability, 26 FCC Rcd 6490 (2011) (proposing a range of $4500 to $10,000 per unlawful call, depending on the egregiousness, for a total of $342,000 for a total of 43 unlawful calls), *Security First of Alabama* Forfeiture Order, 30 FCC Rcd 2377 (2015) (imposing proposed forfeiture); *Warrior Custom Golf, Inc.*, Notice of Apparent Liability for Forfeiture, 19 FCC Rcd 23648, 23652 (2004) (*Warrior Golf Club Inc. NAL*), *Warrior Custom Golf, Inc.,* Order and Consent Decree, 21 FCC Rcd 6461 (2006) (company paid proposed forfeiture); *see also Travel Club Marketing, Inc.*, Notice of Apparent Liability for Forfeiture, 26 FCC Rcd 15831, 15835-36 (2011) (recognizing that the Commission had historically imposed a $4,500 base forfeiture per violation, and proposing an upward adjustment to impose the statutory maximum of $16,000 per call, for a total forfeiture of $2,960,000), *Travel Club Marketing, Inc.*, Forfeiture Order, 30 FCC Rcd 8861 (2015) (imposing proposed forfeiture).

[96] *Warrior Golf Club Inc. NAL*, 19 FCC Rcd at 23651.

allowable forfeiture is now $20,731 per unlawful call. Thus, when taking inflation into account, we find that $4,500 per unlawful call is significantly lower in terms of real dollars than the penalties imposed in years past. Accordingly, Respondents' argument that the Commission's proposed penalty in this case is larger than the fines imposed in past cases is incorrect. *Second*, the Commission's proposed penalty reflects our careful consideration of the relevant statutory factors; the Commission's Forfeiture Policy Statement; and careful consideration of Respondents' arguments. We found that a base forfeiture of $4,500 per violation multiplied by the number of violations properly reflects the seriousness and scope of Respondents' unlawful actions. Our forfeiture is consistent with precedent and well-established guidelines. Moreover, the long history of FCC action in this area provided Respondents with fair notice of the potential liability for their violations. Just as Congress's amendment to section 227(b)(4)(A) did not change the standard for determining TCPA violations, it did not change the Commission's method of calculating base for base forfeitures for those violations under section 503 of the Act.[97]

39.     *Our Enforcement Action Is Consistent with the First Amendment*. Respondents argue that the robocalls were "political speech protected under the First Amendment, however caustic or undesirable."[98] The content of the calls did not form the basis for any violation alleged in the *Notice*, nor does it factor into this order.[99] The content of the messages is relevant only to the extent that it demonstrates that Respondents were the makers of the calls, and that the calls were previously recorded calls and not live. This is consistent with Supreme Court precedent that has long recognized that the government may introduce "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."[100]

40.     Respondents also allege that the Bureau's collaboration with the Ohio Attorney General (OAG) has tainted this investigation, arguing that the OAG's investigation "involved 'the zealous prosecution of Respondents based on the content of the calls, alone, [which] calls into question the Commission's purportedly content-neutral conclusion.'"[101] The fact that the calls at issue may be the subject of litigation or prosecution elsewhere in part due to their content is irrelevant to the Commission's enforcement action. The Commission frequently collaborates with law enforcement partners and has evidence sharing agreements (or "memoranda of understanding") with many law enforcement organizations.[102] These agreements allow law enforcement agencies to assist each other with obtaining information and evidence relevant to cases of shared interest. But such cooperative efforts do not extend to prosecuting each other's cases. The Commission's action is independent from any criminal case against Respondents filed by the OAG or any other law enforcement agency.

41.     Our action finds that Respondents violated the TCPA by making calls to wireless phones without the recipients' prior express consent.[103] As we made clear in the *Notice*, we provided the details

---

[97] *See* 47 U.S.C. § 227(b)(4).

[98] *Burkman Response*, *supra* note 20, at 5 ("A main point of departure arises from the fact that the alleged robocalls were political speech protected under the First Amendment, however caustic or undesirable. The alleged calls argued for prudential choices and made hyperbolic arguments in favor of one style of voting over another.").

[99] *See Notice*, *supra* note 37, at 12980 (stating that the TCPA applies "regardless of the content of prerecorded messages placed to wireless numbers").

[100] *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see also Street v. New York*, 394 U.S. 576, 594 (1969) (noting that nothing would render a conviction impermissible "merely because an element of the crime was proved by the defendant's words rather than in some other way").

[101] *Burkman Response*, *supra* note 20, at 43.

[102] The Commission currently has evidence sharing agreements with 49 state Attorneys' General. *See* Press Release, Federal Commc'ns Comm'n, *FCC launches formal robocall investigation partnerships with more State Attorneys General* (Mar. 28, 2022), https://www.fcc.gov/document/fcc-launches-new-robocall-investigation-partnerships-more-states.

[103] *See* 47 U.S.C. § 227(b).

13

of the transcript only for the purposes of identifying the specific calling campaign and determining that they consisted of prerecorded messages.[104] The substantive content of Respondents' messages is not relevant to that determination. The Respondents also point to 47 C.F.R. § 64.1200(a)(3) to argue that "calls are exempt from the statutory prohibition "if not made for a commercial purpose" or, as germane here, if they do "not include or introduce an advertisement or constitute telemarketing."[105] But that provision is inapplicable here; it is an exemption for calls to residential phones, not wireless phones.

42. Respondents argue that consumers who receive these unwanted calls could, "in the great American tradition of disengaging from political activity," simply hang up their phones and file a complaint with the Commission.[106] Even if that were true, it does not undo the violations. As the Commission and courts have made clear, the harm associated with robocall campaigns occurs at the time that call is received and is not erased by the consumer simply hanging up on the robocaller.[107] As the Court in *FCC v. Pacifica* noted, "one may hang up on an indecent phone call, but that option does not give the caller a constitutional immunity or avoid a harm that has already taken place."[108] Moreover, consumers *did* file complaints with the Commission in response to these illegal robocalls. These complaints precipitated in part the investigative action by the Commission.[109]

43. *A Downward Adjustment for Inability to Pay or Lack of Prior Offenses Is Not Warranted.* The Commission will not consider reducing or canceling a forfeiture in response to a claim of inability to pay unless the Respondents submit: (1) federal tax returns for the most recent three-year period; (2) financial statements prepared according to generally accepted accounting principles (GAAP); or (3) some other reliable and objective documentation that reflects accurately Respondents' current financial status.[110] Any claim of inability to pay must identify specifically the basis for the claim by reference to the financial documentation submitted.

44. Respondents have failed to provide any tax returns, financial statements, or any other reliable and objective documentation of their inability to pay. Instead, Respondents simply assert that Commission knows "the proposed forfeiture would bankrupt Respondents."[111] However, the corporate bank records of Burkman & Associates which the Commission independently obtained through a subpoena are not sufficient to provide any reliable and objective documentation of an inability to pay. Moreover, inability to pay is only one of several factors that the Commission will consider in determining the appropriate forfeiture, and we have discretion to not reduce or cancel the forfeiture if other prongs of 47 U.S.C. § 503(b)(2)(E) support that result.

---

[104] *Notice*, *supra* note 37, at n.1 ("While we provide details of the transcript for purposes of the Background, we reiterate that the content of the calls is not relevant to our determination under the TCPA and the Commission's rules.").

[105] *Burkman Response*, *supra* note 20, at 20.

[106] *Id.* at 4.

[107] *See 2018 Report and Order*, *supra* note 81, at 1026, para. 4.

[108] *FCC v. Pacifica Foundation*, 438 U.S. 726, 749 (1978). In ruling that the Commission has the power to regulate a radio broadcast that is indecent but not obscene, Justice John Paul Stevens wrote for the plurality "To say that one may avoid further offense by turning off the radio when he hears indecent language is like saying that the remedy for an assault is to run away after the first blow. One may hang up on an indecent phone call, but that option does not give the caller a constitutional immunity or avoid a harm that has already taken place. . . . We simply hold that when the Commission finds that a pig has entered the parlor, the exercise of its regulatory power does not depend on proof that the pig is obscene." *Id.* at 748-51.

[109] *See* Complaint #4182753; *see also* Complaint #4183268 (on File No. EB-TCD-21-00032652).

[110] *Neal Davis*, Notice of Apparent Liability, 26 FCC Rcd 14375, 14378, para. 11 (EB 2011); *see Greenwood Acres Baptist Church*, Memorandum Opinion and Order, 22 FCC Rcd 1442, 1448, para. 20 (EB 2007) (specifying same).

[111] *Burkman Response*, *supra* note 20, at 6.

45.	Respondents argue that the proposed forfeiture is unlawful, excessive, and arbitrary because as the robocalls were "facially lawful" insofar as they complied with the FCC's technical requirements under section § 227(d)(3)(A), had no commercial or pecuniary motive, and represent the first time that the Commission is relying on the TRACED Act's amendments to the TCPA to issue a Notice without first issuing a citation.  First, as discussed above, this proceeding concerns violations of section 227(b) of the Act and section 64.1200(a)(1)(iii) of the rules, which are independent of the technical requirements in section 227(d)(3)(A) of the Act and section 64.1200(b) of the rules.

46.	Respondents further argue that the proposed forfeiture is unlawful, excessive, and arbitrary because only 1.3 percent of the total number of calls made were to wireless phones, and that this de minimis number cannot reasonably support an approximately $5.1 million penalty under the circumstances.  We find these arguments unpersuasive.  Each call to a wireless phone represents a single violation of the TCPA for which the Commission proposed a base forfeiture of $4,500.  The base forfeiture amount was then multiplied by the number of violations (1,141) for a total forfeiture of $5,134,500.  This is consistent with the Commission's prior cases and with the statute.  Further, the percentage of calls that were lawful is irrelevant to this enforcement action.  We have identified the illegal robocalls and have taken action accordingly.

47.	The Commission has on multiple occasions used a base forfeiture of $4,500 for violations of section 227(b).  We find those cases analogous and follow them here.  Although most of the previous decisions involved a smaller number of calls than the number of apparently unlawful calls that Burkman and Wohl made, we do not think this is a basis to deviate from the precedent, for the following reasons.

48.	*First*, the Commission began imposing $4,500 per call forfeitures for unlawful robocalls at least as early as 2006.  The Commission noted, in 2006, that the maximum allowable forfeiture at that time was $11,000.[112]  In comparison, the maximum allowable forfeiture at the time the Notice was issued was $20,731 per unlawful call.[113]  Thus, when taking inflation into account, we find that $4,500 per unlawful call is appropriate.  Our proposed forfeiture is thus consistent with precedent.

49.	*Second*, after considering the relevant statutory factors and the Commission's Forfeiture Policy Statement, and after careful consideration of Respondents' arguments we concluded, based upon the evidence before us, that the proposed base forfeiture of $4,500 per violation multiplied by the number of violations yielding a total forfeiture of $5,134,500 properly reflects the seriousness, duration, and scope of Respondents' violations.

50.	*The Evidence Supports Finding Burkman and Wohl Jointly and Severally Liable with Burkman & Associates.*  The evidence shows that Burkman, Wohl, and Burkman & Associates were jointly and severally involved in making the robocalls at issue.  Respondents do not challenge the Bureau's personal liability analysis.  As discussed in the *Notice*,[114] Burkman acknowledged that he prepared the messages and caused them to be sent.[115]  E-mail exchanges with the dialing platform further reflect that Burkman had a key role in deciding the content of the messages and the area codes to which the calls would be sent.[116]  Burkman's personal wireless phone number was listed as the calling party on the recipients' caller ID.  The recorded messages also identified Burkman and Wohl by name. Wohl personally publicly claims to be a co-founder of "Project-1599," which is the moniker given to the

---

[112] *See Warrior Golf Club Inc. NAL*, *supra* note 95, at 23651.

[113] *See* 47 U.S.C. § 503(b)(2)(D); 47 CFR § 1.80(b)(9); *see also* Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation, Order, 35 FCC Rcd 14879 (EB 2020) (adjusting amounts for inflation).

[114] *Notice*, *supra* note 38.

[115] *See* Preliminary Examination at 65, *Michigan v. Burkman*, No. 20-060911 (Mich. Dist. Ct. Oct. 29, 2020).

[116] *See* E-mail Records (on file in EB-TCD-21-00032652).

Case 1:24-cv-00181 Document 1-2 Filed 02/02/24 Page 17 of 19 PageID# 52

Federal Communications Commission	FCC 23-44

robocalling campaign.[117] There is ample evidence that Wohl also played a key role in determining who would receive the robocalls.[118] Wohl acknowledged creating the calls and causing them to be transmitted. Burkman & Associates paid for the dialing platforms that physically dialed the robocalls.[119] Accordingly, the evidence shows that Burkman, Wohl, and Burkman & Associates were jointly and severally involved in making the robocalls at issue and we will hold each liable for a forfeiture of $5,134,500.

51. In sum, we have carefully considered all of Respondents' arguments and find them unconvincing. We therefore uphold the forfeiture and impose a penalty of $5,134,500 for which John M. Burkman, Jacob Alexander Wohl, and J.M. Burkman & Associates LLC shall be jointly and severally liable.

## IV. ORDERING CLAUSES

52. Accordingly, **IT IS ORDERED** that, pursuant to section 503(b) of the Act, 47 U.S.C. § 503(b), and section 1.80(b) of the Commission's rules, 47 CFR § 1.80(b), John M. Burkman, Jacob Alexander Wohl, and J.M. Burkman and Associates LLC **ARE JOINTLY AND SEVERALLY LIABLE FOR A MONETARY FORFEITURE** in the amount of five million one hundred thirty-four thousand five hundred dollars ($5,134,500), for willful and repeated violations of section 227(b)(1)(A)(iii) of the Act, 47 U.S.C. § 227(b)(1)(A)(iii), and section 64.1200(a)(1)(iii) of the Commission's rules, 47 CFR § 64.1200(a)(1)(iii).

53. Payment of the forfeiture shall be made in the manner provided for in section 1.80 of the Commission's rules within thirty (30) calendar days after the release of this Forfeiture Order.[120] John M. Burkman, Jacob Alexander Wohl, and J.M. Burkman and Associates LLC shall send electronic notification of payment to Lisa Ford, Enforcement Bureau, Federal Communications Commission, at lisa.ford@fcc.gov on the date said payment is made. If the forfeiture is not paid within the period specified, the case may be referred to the U.S. Department of Justice for enforcement of the forfeiture pursuant to section 504(a) of the Act.[121]

54. In order for John M. Burkman, Jacob Alexander Wohl, and J.M. Burkman and Associates LLC to pay the proposed forfeiture, John M. Burkman, Jacob Alexander Wohl, and J.M. Burkman and Associates LLC shall notify Lisa Ford at Lisa.Ford@fcc.gov of its intent to pay, whereupon an invoice will be posted in the Commission's Registration System (CORES) at https://apps.fcc.gov/cores/userLogin.do. Payment of the forfeiture must be made by credit card using CORES at https://apps.fcc.gov/cores/userLogin.do, ACH (Automated Clearing House) debit from a bank account, or by wire transfer from a bank account. The Commission no longer accepts forfeiture payments by check or money order. Below are instructions that payors should follow based on the form of payment selected:[122]

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001. In the OBI field, enter the FRN(s) captioned

---

[117] The recordings themselves refer to Project-1599 as "the civil rights organization founded by Jack Burkman and Jacob Wohl." *See* Robocall Audio File (on file in EB-TCD-21-00032652).

[118] *See* Preliminary Examination at 60, *Michigan v. Burkman*, No. 20-060911 (36th Dist. Oct. 29, 2020).

[119] *See* {[ ▆▆▆▆▆▆▆▆▆▆ ]} Subpoena Response (Mar. 5, 2021) (on file in EB-TCD-21-00032652) (including a scanned copy of a check issues to {[ ▆▆▆▆▆▆▆▆▆▆ ]} signed by Respondent).

[120] 47 CFR § 1.80.

[121] 47 U.S.C. § 504(a).

[122] For questions regarding payment procedures, please contact the Financial Operations Group Help Desk by phone at 1-877-480-3201 (option #1).

Case 1:24-cv-00181   Document 1-2   Filed 02/02/24   Page 18 of 19 PageID# 53

Federal Communications Commission                                                FCC 23-44

- above and the letters "FORF".  In addition, a completed Form 159[123] or printed CORES form[124] must be faxed to the Federal Communications Commission at 202-418-2843 or e-mailed to RROGWireFaxes@fcc.gov on the same business day the wire transfer is initiated.  Failure to provide all required information in Form 159 or CORES may result in payment not being recognized as having been received.  When completing FCC Form 159 or CORES, enter the Account Number in block number 23A (call sign/other ID), enter the letters "FORF" in block number 24A (payment type code), and enter in block number 11 the FRN(s) captioned above (Payor FRN).[125]  For additional detail and wire transfer instructions, go to https://www.fcc.gov/licensing-databases/fees/wire-transfer.

- Payment by credit card must be made by using CORES at https://apps.fcc.gov/cores/userLogin.do.  To pay by credit card, log-in using the FCC Username associated to the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Manage Existing FRNs | FRN Financial | Bills & Fees" from the CORES Menu, then select FRN Financial and the view/make payments option next to the FRN.  Select the "Open Bills" tab and find the bill number associated with the NAL Acct. No.  The bill number is the NAL Acct. No. with the first two digits excluded (e.g., NAL 1912345678 would be associated with FCC Bill Number 12345678).  After selecting the bill for payment, choose the "Pay by Credit Card" option.  Please note that there is a $24,999.99 limit on credit card transactions.

- Payment by ACH must be made by using CORES at https://apps.fcc.gov/cores/userLogin.do.  To pay by ACH, log in using the FCC Username associated to the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Manage Existing FRNs | FRN Financial | Bills & Fees" on the CORES Menu, then select FRN Financial and the view/make payments option next to the FRN. Select the "Open Bills" tab and find the bill number associated with the  NAL Acct. No.  The bill number is the NAL Acct. No. with the first two digits excluded (e.g., NAL 1912345678 would be associated with FCC Bill Number 12345678).  Finally, choose the "Pay from Bank Account" option.  Please contact the appropriate financial institution to confirm the correct Routing Number and the correct account number from which payment will be made and verify with that financial institution that the designated account has authorization to accept ACH transactions.

55.     Any request for making full payment over time under an installment plan should be sent to:  Chief Financial Officer – Financial Operations, Federal Communications Commission, 45 L Street NE, Washington, DC 20554.[126] Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by telephone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

56.     **IT IS FURTHER ORDERED** that a copy of this Forfeiture Order shall be sent by first class mail and certified mail, return receipt requested, to John M. Burkman and Jacob Alexander Wohl at

---

[123] FCC Form 159 is accessible at https://www.fcc.gov/licensing-databases/fees/fcc-remittance-advice-form-159.

[124] Information completed using the Commission's Registration System (CORES) does not require the submission of an FCC Form 159.  CORES is accessible at https://apps.fcc.gov/cores/userLogin.do.

[125] Instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

[126] *See* 47 CFR § 1.1914.

| Federal Communications Commission | FCC 23-44 |
|---|---|

{[▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇]}, and J.M. Burkman and Associates LLC at {[▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇]}.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary