# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, et al.,

                    Plaintiffs,

        - against -

JACOB WOHL, et al.,

                    Defendants.

---

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_3/8/2023__
```

**20 Civ. 8668 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiffs National Coalition on Black Civic Participation ("NCBCP") and Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, and Andrea Sferes (collectively, the "Individual Plaintiffs" and with NCBCP, the "Original Plaintiffs") filed this action against defendants Jacob Wohl ("Wohl"), Jack Burkman ("Burkman"), J.M. Burkman & Associates, LLC ("Burkman Associates"), Project 1599, and John and Jane Does 1 through 10 (collectively, "Defendants"). (See "Original Complaint," Dkt. No. 1; "Amended Complaint," Dkt. No. 149.) On May 19, 2021, Letitia James, Attorney General of the State of New York (the "NY AG" or "Plaintiff-Intervenor," and with the Original Plaintiffs, "Plaintiffs") on behalf of the People of the State of New York, filed a Complaint in Intervention against Defendants as well as Robert Mahanian ("Mahanian") and Message Communications, Inc. ("Message," and with

Mahanian, the "Message Defendants"). (See "Complaint in Intervention," Dkt. No. 102.)

Together, Plaintiffs allege that Defendants sent robocalls containing false information intended to prevent recipients from voting by mail through threats and intimidation in violation of Section 11(b) of the Voting Rights Act of 1965 (the "VRA"), 52 U.S.C. § 10307(b), and Section 2 of the Ku Klux Klan Act of 1870 (the "KKK Act"), 42 U.S.C. § 1985(3). (See Amended Complaint; Complaint in Intervention.) The NY AG additionally alleges violations of the following: Section 131(b) of the Civil Rights Act of 1957 (the "Civil Rights Act"), 52 U.S.C. § 10101(b); Sections 40-c and 40-d of the New York Civil Rights Law (the "NYCRL"); Section 9 of the NYCRL; and Section 63(12) of the New York Executive Law (the "NYEL").[1] (See Complaint in Intervention.)

Now pending before the Court are the parties' cross motions for summary judgment. Defendants seek summary judgment dismissing Plaintiffs' claims. (See "Defs. MSJ," Dkt. No. 208; "Defs. MSJ Brief," Dkt. No. 209.) Plaintiffs jointly seek summary judgment as to liability on all their claims. (See "Pls. MSJ," Dkt. No. 212; "Pls. MSJ Brief," Dkt. No.

---

[1] The NY AG's allegations that Sections 40-c and 40-d of the NYCRL and Section 63(12) of the NYEL were violated were made against both Defendants and the Message Defendants. However, the Message Defendants were dismissed from the action on June 2, 2022. (See Dkt. No. 196.)

213.) Plaintiffs also move on two other matters: (1) Plaintiffs jointly move to strike Defendants' expert witness testimony (see "Pls. MTS Expert," Dkt. No. 219) and (2) Plaintiffs jointly move to strike Defendants' Rule 56.1 Statement of Undisputed Facts (see "Pls. MTS Defs. Rule 56.1 Stmt.," Dkt. No. 239). For the reasons discussed below, Plaintiffs' motion to strike Defendants' expert witness testimony is **GRANTED**, in part, and **DENIED**, in part; Plaintiffs' motion to strike Defendants' Rule 56.1 Statement is **GRANTED**, in part, and **DENIED**, in part; Defendants' motion for summary judgment is **DENIED** in its entirety; and Plaintiffs' joint motion for summary judgment as to liability on all claims is hereby **GRANTED** in its entirety.

## I. <u>BACKGROUND</u>

A. FACTUAL BACKGROUND[2]

### 1. Defendants' Robocall Operation

---

[2] Except as otherwise noted, the following background derives from the undisputed facts as set forth by the parties in their Local Rule 56.1 Statements of Undisputed Material Facts and responses thereto. These include: Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Pls. Rule 56.1 Stmt.," Dkt. No. 214); Plaintiffs' Additional Statements of Undisputed Fact ("Pls. Add'l Rule 56.1 Stmt.," Dkt. No. 241); Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Defs. Rule 56.1 Stmt.," Dkt. No. 226); Plaintiffs' Counter-Statement to Defendants' Rule 56.1 Statement ("Pls. Rule 56.1 CS," Dkt. No. 241); Defendants' Counter-Statement to Plaintiffs' Rule 56.1 Statement ("Defs. Rule 56.1 CS," Dkt. No. 237); and Plaintiffs' Reply to Defendants' Counter-Statement ("Pls. Reply to Defs. Rule 56.1 CS," Dkt. No. 246). The Court has also considered the full record submitted by the parties, including the following declarations and their accompanying exhibits: the Declaration of Randy E. Kleinman in support of Defendants' Motion ("Kleinman Decl.," Dkt. No. 210); the Declaration of Franklin Monsour Jr. in support of

Burkman is a Washington D.C.-based lobbyist and the founder of the lobbying firm Burkman Associates. Wohl is a political operative based out of California, and with Burkman, co-founded Project 1599, a political organization that was launched as a "candidate vetting apparatus," primarily targeting Democratic candidates and seeking to influence the November 2020 United States presidential election (the "2020 Election"). (Dkt. No. 216-13; see also Pls. Rule 56.1 Stmt. ¶ 5.)

This case begins in January 2019 when Wohl drafted a confidential prospectus for the Arlington Center for Political Intelligence ("ACPI"), "a conservative political intelligence and advocacy organization," in order to obtain seed funding for the 2020 Election cycle. ("ACPI Prospectus" or "Prospectus," Dkt. No. 216-14 at 2.)[3] The Prospectus described Wohl's plans to utilize social media, traditional media, and other technology to suppress voter turnout among

---

Plaintiffs' Motion ("Monsour Decl.," Dkt. No. 216); the Declaration of Rick Sawyer in support of Plaintiffs' Motion ("Sawyer Decl.," Dkt. No. 217); the Declaration of Douglas A. Kellner in support of Plaintiffs' Motion ("Kellner Decl.," Dkt. No. 218); the Declaration of Randy E. Kleinman in opposition to Plaintiffs' Motion ("Kleinman Opp. Decl.," Dkt. No. 238); and the Declaration of Marc P. Epstein in opposition to Defendants' Motion ("Epstein Opp. Decl.," Dkt. No. 242). No further citations to the record will be made herein except as specifically cited. The Court construes any disputed facts discussed in this section and the justifiable inferences arising therefrom in the light most favorable to the non-movant for each motion, as required under the standard set forth in Section II.C. below.

[3] The page count of the ACPI Prospectus does not include the Exhibit cover page.

"important Demographics of Democrat voters," which included Black voters. (Id. at 13; Pls. Rule 56.1 Stmt. ¶ 6.) For example, the Prospectus described in detail how Wohl, through ACPI, would achieve one of its objectives of "[b]uild[ing] up left-wing online properties with a large following, only to have those properties direct followers to NOT vote come election day[]." (ACPI Prospectus at 13.) Via a flowchart, the Prospectus further outlined ACPI's strategy for influencing mainstream media, which involved "mak[ing] shit up," and "misdirect[ing] with details aimed to confuse, leading to more inquiry." (Id. at 11.)

Wohl's yet-to-be-realized plans were made public on June 4, 2019 when the *Washington Post* spotlighted Wohl and Burkman for their strategy to "smear the 2020 Democrats." ("Post Article," Dkt. No. 216-15.) The *Washington Post* highlighted Wohl's draft plan and his goal of raising money in order to "disseminate false information about Democratic presidential candidates to swing political betting markets." (Post Article at 10.)

Consistent with Wohl's proposal and the public declarations revealed in the *Washington Post*, Defendants set into motion a full-scale voter suppression operation during the summer of 2020 to discourage eligible voters from voting by targeting mail-in voting in the 2020 Election. In an email

to Burkman, Wohl wrote, "we must HIJACK this boring election," to which Burkman responded with, "yes America needs w b."[4] (Pls. Rule 56.1 Stmt. ¶ 6.)

Shifting their project into gear, Wohl and Burkman retained Message to transmit through a robocall, misleading and false messages carefully crafted to dissuade tens of thousands of voters across the United States from voting by mail. Headed by Mahanian, Message is a corporation that owns, operates, and hosts a telecommunication platform that broadcasts robocalls or prerecorded telephone messages for a fee.

Prior to its launch, Burkman corresponded with Mahanian regarding payment for the robocall ("Robocall"). Mahanian emailed Burkman the instructions for payment, to which Burkman responded, "Check to you Robert just went out in the 2 day pouch you will have in 2-3 days then we attack." (Id. ¶ 8.) Burkman issued a check for $1,000 to Message from the bank account of his firm, Burkman Associates. Burkman then emailed Mahanian to confirm whether payment had been received and informed Mahanian that he and Wohl were "ready to begin the robo calls[]" (Id. ¶ 10.) Mahanian confirmed that he

---

[4] The initials "w b" likely refers to Wohl and Burkman.

received the check, credited Burkman's account, and declared that Burkman was "all set." (Id.)

On August 24, 2020, in Los Angeles, Wohl recruited a Black voice actress named Jana Hunt ("Hunt") through a Craigslist advertisement titled "Los Angeles Black Female Voice Over" to read and record Defendants' script for the Robocall. (Id. ¶ 12.) Hunt was paid a retainer fee of $50 and a combined total of $250 after she provided her voiceover services.

The following day, Wohl emailed Burkman the audio file of the Robocall recorded by Hunt. In that email, Wohl suggested which geographic locales to target for the Robocall, writing, "We should send [the Robocall] to black neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta, and Cleveland." (Id. ¶ 14.) Burkman replied with, "cleveland phila minn chicago nyc detroit." (Id.)

On August 26, 2020, through an account held by Burkman Associates, Message transmitted the Robocall to 85,307 phone numbers across the country, including 5,494 calls with New York area codes. (Sawyer Decl. ¶ 2.) The Robocall contained the following message:

Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that

> if you vote by mail, your personal information will be
> part of a public database that will be used by police
> departments to track down old warrants and be used by
> credit card companies to collect outstanding debts? The
> CDC is even pushing to use records for mail-in voting to
> track people for mandatory vaccines. Don't be finessed
> into giving your private information to the man, stay
> safe and beware of vote by mail.

(Pls. Rule 56.1 Stmt. ¶ 4; Defs. Rule 56.1 Stmt. ¶ 3.)

Ultimately, the Robocall was distributed to zip codes in the following cities: Cleveland, Ohio; Minneapolis, Minnesota; Chicago, Illinois; Pittsburgh and Philadelphia, Pennsylvania; Detroit, Michigan; New York, New York; and Arlington, Virginia. The caller ID information for the Robocall showed that the call was made under Burkman's name with his personal phone number. On October 26, 2020, at the hearing on Plaintiffs' request for injunctive relief in this action, both Wohl and Burkman admitted to the Court that they prepared the Robocall message and caused the Robocall to be sent.

The Robocall message made three claims about mail-in-voting: (1) that the police will use vote-by-mail information to track persons with outstanding warrants; (2) that vote-by-mail information will be used by debt collectors to collect unpaid debts; and (3) that the Centers for Disease Control and Prevention (the "CDC") will access vote-by-mail information to track for mandatory vaccinations.

Several hours after the Robocall was broadcasted on August 26, 2020, Burkman emailed Wohl, "[I] love these robo calls [sic] . . . getting angry black call backs . . . win or lose . . . the black robo was a great jw[5] idea." (Id. ¶ 17.)

### 2. Impact of the Robocall on Plaintiffs

NCBCP "is a non-partisan nonprofit organization dedicated to increasing civic engagement and voter participation in Black and underserved communities." (Id. ¶ 18; Defs. Rule 56.1 Stmt. ¶ 10.) NCBCP "engage[s] people in all aspects of public life, including voting," and "encourage[s] participation in a fair, just and barrier-free democracy." (Pls. Rule 56.1 Stmt. ¶ 18.)

NCBCP oversees and runs the Black Women's Roundtable ("BWR") which seeks "to engage, educate, organize, and mobilize Black Americans of all ages to participate in our democracy." (Id.) When the Robocall launched, the Metro Detroit chapter of BWR ("BWR Metro Detroit") was running a call center in Detroit to increase its community's participation in the 2020 Census.

Upon learning of Defendants' Robocall on August 26, 2020, Tameka Ramsey ("Ramsey"), the lead convener of BWR Metro Detroit, became concerned that the Robocall message would

---

[5] The abbreviation "jw" likely stands for "Jacob Wohl."

intimidate, scare, and ultimately deter Black voters from participating in the upcoming election. As a result, BWR Metro Detroit diverted staff and resources from its Census operation to respond to the claims made in the Robocall, which included "outreach[ing] to partner organizations and community members to make sure they knew that the Robocall was false information." ("Ramsey Decl.," Dkt. No. 216-32 ¶ 10.) Ramsey, along with BWR Metro Detroit co-chair, Chenita Gary ("Gary"), reallocated the organization's resources to address the messages disseminated by the Robocall. (Pls. Add'l Rule 56.1 Stmt. ¶ 2.) This involved creating a new phone banking script, ensuring they had the technology to phone bank to Michigan residents in advance of the November election, "reallocat[ing] dials on ThruTalk," an automated dialer used for phone banking, and meeting and strategizing with management at NCBCP and BWR to respond to the Robocall. (Id. ¶ 3.) In total, "NCBCP reallocated approximately $10,000 to $20,000 worth of time, technological resources, and paid staff to respond to the [R]obocall." (Id.)

The Individual Plaintiffs are residents of New York, Ohio, and Pennsylvania. Plaintiff Mary Winter ("Winter"), a resident and registered voter of Rockland County, New York, received the Robocall and found it "distressing" and "felt intimidated by it" on account of the precautions she had been

taking to avoid contracting COVID-19 and the fact that the
call sought to "undermine[ her] confidence in voting by mail."
("Winter Decl.," Dkt. No. 216-34 ¶¶ 12, 14.) Plaintiff Gene
Steinberg ("Steinberg"), also a resident and registered voter
of Rockland County, New York, is Winter's partner. Winter
played the Robocall for Steinberg, and he found the call to
be "particularly traumatic," not only because he was planning
to vote by mail to protect himself from COVID-19 but also
because of his past nonviolent criminal conviction.
("Steinberg Decl.," Dkt. No. 216-37 ¶ 13.) He declared that
hearing the Robocall "profoundly scared [him], caused [him]
great anxiety, and made [him] relive earlier traumas." (Id.)
Though he voted in person in the 2020 Election, as a result
of the Robocall, Steinberg unregistered as a voter and
"requested to be removed from the Board of Elections" after
he moved because he did not want anyone else to use his
information "to intimidate" him. (Dkt. No. 216-39 at 16:18-
19; 17:5-6.)

Plaintiff Eda Daniel ("Daniel") is a resident and
registered voter of East Cleveland, Ohio. She declared that
when she heard the Robocall, she was "scared . . . initially,"
finding the statements made in the Robocall to be "very
jarring." ("Daniel Decl.," Dkt. No. 216-6 ¶¶ 5-6.) She
indicated that the Robocall, which she saw came from Burkman's

number, made her "feel both angry and powerless" and that she "felt vulnerable by having this stranger invading [her] home with such pernicious lies." (Id. ¶ 9.) At her deposition, she testified that "[i]t was a very dark moment to get this call" and "[v]ery much an intrusion." (Dkt. No. 242-4 at 77:20; 77:25.) As a result of the Robocall, she no longer wants to answer her phone because she feels "anxious and apprehensive." (Daniel Decl. ¶ 9.)

Plaintiff Andrea Sferes ("Sferes"), a resident and registered voter of Westchester, New York, felt "shocked, furious and sickened," by the Robocall after she listened to it on account of her outstanding medical debt. ("Sferes Decl.," Dkt. No. 216-7 ¶¶ 7-8.) She found the call "highly persuasive" and worried whether her information would be shared with debt collectors. (Id.)

Plaintiff Karen Slaven ("Slaven") is a resident and registered voter of Cuyahoga County, Ohio, who felt "angry and frustrated" when she received the Robocall because she spent hours educating her community about voting, and the Robocall detracted from her efforts. (Dkt. No. 216-45 at 86:10-14.) Plaintiff Kate Kennedy ("Kennedy"), also a resident and registered voter of Cuyahoga County, Ohio, received the call, which made her "upset" and "angry." (Dkt. No. 216-48 at 61:6-8.)

Plaintiff Sarah Wolff ("Wolff") is a resident and registered voter of New York County, New York, and she was "infuriat[ed]" and "disgusted" by the call's efforts to dissuade others from voting. ("Wolff Decl.," Dkt. No. 216-8 ¶¶ 7-8.) Plaintiff Nancy Hart ("Hart") is registered to vote in Allegheny County, Pennsylvania and became "irate" and "infuriated" when she listened to the Robocall. ("Hart Decl.," Dkt. No. 216-5 ¶¶ 7-8.) Hart had invested time "encouraging other people to vote and promoting voting as a civic duty," and the Robocall "sought to undermine confidence in the voting process." (Id. ¶ 9.)

In New York, the state's election law "prohibits using information in the statewide voter registration for non-election purposes." (Pls. Rule 56.1 Stmt. ¶ 28.) According to Douglas Kellner ("Kellner"), the Commissioner and Co-Chair of the New York State Board of Elections, no database exists in New York "that police departments, credit card companies, the Centers for Disease Control, or anyone else may access to show voters who used or applied for absentee ballots for any purpose other than the conduct of elections." (Kellner Decl. ¶ 22; "Kellner Report,"[6] Dkt. No. 216-62 at 3-4; see also Pls.

---

[6] Because Kellner's Report does not have page numbers, the Court begins the page count on the first page of the Report, excluding the exhibit cover page.

Rule 56.1 Stmt. ¶ 28.)

Further, during the height of the COVID-19 pandemic, the State of New York adopted various precautionary measures in anticipation of the 2020 Election, "enact[ing] numerous election-law related bills" to expand the availability of absentee ballots, thereby ensuring that eligible voters could safely participate in the 2020 Election. (Kellner Decl. ¶¶ 14-15.)

B.   PROCEDURAL HISTORY

The Original Plaintiffs commenced this action against Defendants on October 16, 2020, alleging (1) violation of Section 11(b) of the VRA, and (2) violation of Section 2 of the KKK Act. On October 22, 2020, the Original Plaintiffs moved for a temporary restraining order ("TRO") to enjoin Defendants from disseminating additional robocalls ahead of the 2020 Election. The Court held a hearing on the Original Plaintiffs' request for injunctive relief on October 26, 2020, at which defendants Burkman and Wohl made certain admissions, including that they had caused the Robocall to be issued. (See "TRO Hearing Tr.," Dkt. No. 53 at 12:18-13:2, 15:15-21.) The Court granted the Original Plaintiffs' motion for a TRO on October 28, 2020. See Nat'l Coalition on Black Civic Participation v. Wohl ("NCBCP I"), 498 F. Supp. 3d 457 (S.D.N.Y. 2020).

In both Michigan and Ohio, criminal charges were filed against Burkman and Wohl for their conduct that forms the basis of this litigation.[7] In Ohio, Defendants pled guilty to telecommunications fraud under Ohio Revised Code Section 2913.05 on October 24, 2022.[8] (See Dkt. No. 252-1 at 14:20-15:3.)

---

[7] On October 1, 2020, in Michigan, Burkman and Wohl were charged with one count of intimidating voters; one count of conspiracy to commit an election law violation; one count of using a computer to commit an election law violation; and using a computer to commit the crime of conspiracy. See Press Release, Dep't of Attorney Gen., AG Nessel Files Felony Charges Against Jack Burkman, Jacob Wohl in Voter-Suppression Robocalls Investigation (Oct. 1, 2020), available at https://www.michigan.gov/ag/news/press-releases/2020/10/01/ag-nessel-files-felony-charges-against-jack-burkman-jacob-wohl. On October 27, 2020, Burkman and Wohl were also indicted in Ohio on eight counts of telecommunications fraud and seven counts of bribery, "[a]ttempt[ing] by intimidation, coercion, or other unlawful means to induce such delegate or elector to register or refrain from registering or to vote or refrain from voting at a primary, convention, or election for a particular person, question, or issue." Press Release, Cuyahoga Cty. Office of the Prosecutor, Virginia and California Duo Indicted as Part of Voter Intimidation Robocall Scam that Targeted Midwestern Minority Communities (Oct. 27, 2020), available at http://prosecutor.cuyahogacounty.us/en-US/duo-indicted-voter-intimidation-scam-targeted-minority-communities.aspx (citation omitted). The Michigan and Ohio charges arose from the dissemination of the Robocall at issue in the instant action.

[8] Section 2913.05 of the Ohio Revised Code, under which Defendants pled guilty, states:

> (A) No person, having devised a scheme to defraud, shall knowingly disseminate, transmit, or cause to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, telecommunications service, or voice over internet protocol service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud.

> (B) No person, with the intent to defraud, cause harm, or wrongfully obtain anything of value, shall knowingly cause, directly or indirectly, any caller identification service to transmit or display misleading or inaccurate caller identification information in connection with any telecommunication service or voice over internet protocol service.

Ohio Rev. Code § 2913.05.

On October 29, 2020, the Court denied both Defendants'
motions for reconsideration and a stay pending resolution of
their criminal cases. Defendants then moved to dismiss the
Original Complaint, which the Court likewise denied. See
Nat'l Coalition on Black Civic Participation v. Wohl ("NCBCP
II"), 512 F. Supp. 3d 500 (S.D.N.Y. 2021). On January 15,
2021, Defendants filed a renewed motion for a stay, which the
Court denied. Defendants appealed the denial of the renewed
motion for a stay.

On May 6, 2021, the NY AG moved to intervene in the
action, which the Court granted. Subsequently, the NY AG filed
the Complaint in Intervention against Defendants and the
Message Defendants, alleging the claims detailed above.

On July 26, 2021, the Message Defendants filed a letter
sent to the NY AG identifying purported deficiencies with the
Complaint in Intervention's claims against them and
requesting their dismissal. After the parties exchanged
letters and briefing, with the parties' consent, the letters
were deemed a fully briefed Motion to Dismiss, which the Court
denied on September 17, 2021. After mediation between the
Message Defendants and Plaintiffs, the Message Defendants
were dismissed from the action on June 2, 2022.

Upon completion of discovery, the parties filed their
respective motions for summary judgment on July 29, 2022.

(See Defs. MSJ; Defs. MSJ Brief; Pls. MSJ; Pls. MSJ Brief.) Defendants filed their Rule 56.1 Statement on August 4, 2022. (See Defs. Rule 56.1 Stmt.) On August 12, 2022, Plaintiffs filed their joint opposition to Defendants' motion for summary judgment and their joint motion to strike Defendants' Rule 56.1 Statement. (See "Pls. MSJ Opp. and MTS," Dkt. No. 240; "Pls. MTS Defs. Rule 56.1 Stmt.," Dkt. No. 239.) Plaintiffs also filed their counter-statement to Defendants' Rule 56.1 Statement, which included Additional Statements of Undisputed Fact. (See Pls. Rule 56.1 CS; Pls. Add'l Rule 56.1 Stmt.) Defendants filed their reply in support of their motion for summary judgment on August 19, 2022. (See "Defs. MSJ Reply," Dkt. No. 244.)

Plaintiffs filed their Rule 56.1 Statement on July 29, 2022. (See Pls. Rule 56.1 Stmt.) On August 12, 2022, Defendants filed their opposition to Plaintiffs' joint motion for summary judgment (see "Defs. MSJ Opp.," Dkt. No. 236) and their counter-statement to Plaintiffs' Rule 56.1 statement (see Defs. Rule 56.1 CS). Plaintiffs filed their joint reply in support of their summary judgment motion on August 19, 2022 (see "Pls. MSJ Reply," Dkt. No. 245), and their joint reply to Defendants' counter-statement to Plaintiffs' Rule 56.1 Statement (see Pls. Reply to Defs. Rule 56.1 CS).

Additionally, Plaintiffs filed a letter motion to strike

the report of Defendants' expert witness, Charles Ribando ("Ribando"). (See Pls. MTS Expert.) Defendants filed their opposition to Plaintiffs' motion to strike on August 4, 2022. (See "Defs. Opp. to MTS Expert," Dkt. No. 225.)

The Court further granted leave to various organizations to file amicus briefs, including Protect Democracy Project (see "Protect Democracy Amicus," Dkt. No. 215); the New York Civil Liberties Union (the "NYCLU") (see "NYCLU Amicus," Dkt. No. 227); and the Electronic Privacy Information Center ("EPIC") (see "EPIC Amicus," Dkt. No. 248). The United States of America also filed a Statement of Interest regarding Plaintiffs' joint motion for summary judgment. (See "USA Statement of Interest," Dkt. No. 235.)

On January 9, 2023, Plaintiffs filed a letter notifying the Court that Defendants pled guilty to one count of telecommunications fraud in Ohio state criminal court. (See Dkt. No. 252.) Plaintiffs also filed a notice of supplementary authority informing the Court of a recent federal court decision by Judge Nicholas G. Garaufis in the Eastern District of New York, in which the court addressed First Amendment arguments similar to those raised by Defendants in the instant case. (See Dkt. No. 253 (citing United States v. Douglass Mackey, No. 21 Crim. 80, 2023 WL 363595 (E.D.N.Y. Jan. 23, 2023)).)

## II. **LEGAL STANDARD**

A. ADMISSIBILITY OF EXPERT TESTIMONY

Federal Rule of Evidence 702 ("Rule 702") governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588 (1993).

When determining an expert's qualifications, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). A trial court "must consider the totality of a witness's background when evaluating the witness's qualifications to testify as an expert." Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (internal quotation marks and citation omitted).

A district court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant

to the task at hand." Daubert, 509 U.S. at 597. Expert testimony should be excluded based on reliability concerns only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213–14 (2d Cir. 2009) (internal quotation marks omitted). Under the Daubert standard, the trial court thus "functions as the gatekeeper for expert testimony." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). This gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702).

In the Second Circuit, there is "a presumption of admissibility of evidence." Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995); see also In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (noting that "the assumption the court starts with is that a well qualified expert's testimony is admissible"). When admitting or excluding expert evidence, a trial judge has "broad discretion unless his decision is clearly wrong." United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991); see

also Salem v. United States Lines Co., 370 U.S. 31, 35 (1962) (noting that a district court's evidentiary ruling "is to be sustained unless manifestly erroneous").

Further, "[a]s a general rule an expert's testimony on issues of law is inadmissible." Bilzerian, 926 F.2d at 1294. "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." Id.; see also S.E.C. v. Lyon, No. 06 Civ. 14338, 2009 WL 6325519, at *1 (S.D.N.Y. Mar. 18, 2009) ("[T]he 'conclusions' defendants' experts seek to draw from those opinions are inappropriate for expert testimony, as they amount almost entirely to conclusions of fact or evidentiary weight that are for a jury to reach, or conclusions of law that will be resolved by this Court."). Also, in connection with Federal Rule of Evidence 704, the advisory committee has made clear that, together, Federal Rules of Evidence 701 (opinion testimony by a lay witness), 702, and 403 (relevance) "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704, Advisory Committee Notes. "If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not

include that evidence." <u>Colon ex rel. Molina v. BIC USA, Inc.</u>,
199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

B.  <u>ADMISSIBILITY OF LOCAL CIVIL RULE 56.1 STATEMENT</u>

Local Civil Rule 56.1 ("Rule 56.1") seeks "to streamline
the consideration of summary judgment motions by freeing
district courts from the need to hunt through voluminous
records without guidance from the parties." <u>Holtz v.
Rockefeller & Co., Inc.</u>, 258 F.3d 62, 74 (2d Cir. 2001)
(internal citation omitted).

Rule 56.1 requires that:

a) Upon any motion for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure, there shall
be annexed to the notice of motion a separate, short and
concise statement, in numbered paragraphs, of the
material facts as to which the moving party contends
there is no genuine issue to be tried. Failure to submit
such a statement may constitute grounds for denial of
the motion.
(b) The papers opposing a motion for summary judgment
shall include a correspondingly numbered paragraph
responding to each numbered paragraph in the statement
of the moving party, and if necessary, additional
paragraphs containing a separate, short and concise
statement of additional material facts as to which it is
contended that there exists a genuine issue to be tried.
(c) Each numbered paragraph in the statement of material
facts set forth in the statement required to be served
by the moving party will be deemed to be admitted for
purposes of the motion unless specifically controverted
by a correspondingly numbered paragraph in the statement
required to be served by the opposing party.
(d) Each statement by the movant or opponent pursuant to
Rule 56.1(a) and (b), including each statement
controverting any statement of material fact, must be
followed by citation to evidence which would be

admissible, set forth as required by Fed. R. Civ. P. 56(c).[9]

Local Civ. R. 56.1.

A "Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. Where . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently." Holtz, 258 F.3d at 74. Moreover, a Rule 56.1 statement should not be considered if it is "not based on personal knowledge, contain[s] inadmissible hearsay, [is] conclusory or argumentative or [does] not cite to supporting evidence." Epstein v. Kemper Ins. Cos., 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (internal citation omitted). However, a trial court has the discretion to disregard "any inappropriate portions of [a party's] submissions" and "rel[y] upon admissible evidence" in its analysis. Id. Furthermore, a "trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion . . . ." Monahan v. N.Y. City Dep't of Corrections,

---

[9] The Committee Note to Rule 56.1 states that "any statement pursuant to Local Civil Rule 56.1 must be divided into brief, numbered paragraphs, that any opposing statement must respond specifically and separately to each numbered paragraph in the statement, and that all such paragraphs in both statements and opposing statements must be supported by citations to specific evidence of the kind required by Fed. R. Civ. P. 56(c)."

214 F.3d 275, 292 (2d Cir. 2000) (citing <u>Downes v. Beach</u>, 587 F.2d 469, 472 (10th Cir. 1978)).

C.    <u>SUMMARY JUDGMENT</u>

Summary judgment is appropriate if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In this context, a court's role "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. <u>See</u> <u>Celotex</u>, 477 U.S. at 323; <u>Gallo v. Prudential Residential Servs., L.P.</u>, 22 F.3d 1219, 1223 (2d Cir. 1994). If the moving party satisfies its burden, the non-moving party must provide specific facts showing that there is a genuine issue for trial to survive the motion for summary judgment. <u>See</u> <u>Shannon v. N.Y. City Transit Auth.</u>, 332 F.3d 95, 98–99 (2d Cir. 2003). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48

(1986) (emphasis in original). A factual dispute is material if it "might affect the outcome of the suit," and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party. See Gummo v. Village of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996).

## III. **DISCUSSION**

A.  MOTION TO STRIKE TESTIMONY OF EXPERT WITNESS

Plaintiffs move to strike the opinions in the Report of Defendants' expert, Charles Ribando. In his Report, Ribando offers two opinions: (1) "Voter Registration Records Are Utilized By Law Enforcement, Debt Collectors, and the CDC in the Manner in Which the Robocall Suggests," and (2) "The

Robocall is Not Intimidating." ("Ribando Report" or "Report,"
Dkt. No. 211-10 at 3, 5.)[10] Plaintiffs contend that these
opinions are inadmissible under Rule 702 on two grounds: (1)
they constitute improper legal conclusions, and (2) Ribando
is not "qualified as an expert by knowledge, skill, experience,
training, or education," rendering his opinions unhelpful to
"the trier of fact to understand the evidence or to determine
a fact in issue." (Pls. MTS Expert at 1 (citing Fed. R. Civ.
P. 702).) Defendants assert that they offer Ribando as an
expert witness in response to this Court's October 28, 2020
Order in which the Court found that Defendants provided no
credible evidence supporting the claims made in the Robocall.
(See Defs. Opp. to MTS Expert at 2.) Ribando was thus offered
to provide his opinion regarding the Robocall, specifically
whether the contents were materially true and accurate.

Upon review of Ribando's experience and Report, the
Court is not persuaded that Ribando's background qualifies
him to offer the expert opinions regarding the Robocall in
full. Consequently, the Court grants Plaintiffs' motion, in
part, and denies it, in part.

---

[10] Because the Ribando Report does not have page numbers, the Court begins
the page count on the first page of the Report, excluding the cover pages
of the notice of the expert disclosures.

1. Expert Qualifications[11]

According to the Report, Charles Ribando is a licensed investigator with more than 30 years of experience in law enforcement. Among his credentials, Ribando served as the head supervisor of Detectives and Federal Agents for the New York City Police Department's FBI-NYPD Joint Terrorism Task Force, managed investigations for the Nassau County District Attorney, and was appointed as Nassau County's Deputy County Executive for Public Safety. He has testified in hundreds of cases about police methods and practices and was retained in one criminal case as an expert witness.

In their motion to strike, Plaintiffs argue that Ribando is not qualified as an expert to offer the opinions set forth in his Report. They contend that Ribando lacks both subject-matter experience and the requisite experience of serving as an expert in legal cases to qualify him as an expert in this case. (Pls. MTS Expert at 2.)

First, Plaintiffs take issue with the fact that while Ribando may have experience in the State of New York, the Robocall was delivered to a number of jurisdictions outside of New York, including Cleveland, Ohio; Minneapolis,

---

[11] Though Plaintiffs first raise the issue that Ribando's opinions are improper legal conclusions, the Court will address Ribando's qualifications as an expert as an initial matter.

Minnesota; Chicago, Illinois; Pittsburgh and Philadelphia, Pennsylvania; Detroit, Michigan; and Arlington, Virginia, which accounted for roughly 80,000 phone numbers outside of New York. Thus, even if he were qualified as an expert, he would be able to opine only as to the practices of law enforcement in New York -- and not of any other state -- with any authority. Defendants do not explicitly address this argument but note that Ribando's experience includes working with both New York state and federal law enforcement agencies.

The Court recognizes that law enforcement entities in other states are likely to employ investigative procedures different from those of New York, and that election processes and administration, including the manner in which vote-by-mail is conducted, will vary by state, and even by county. Ribando does not indicate anywhere in the Report that his experience extends beyond New York. Thus, to the extent that the Report serves to render an opinion on the practices of law enforcement, debt collectors, and the CDC in using mail-in voting data in states outside of New York, those opinions are stricken.

More generally, Plaintiffs argue that Ribando is not qualified to opine on the veracity of the statements in the Robocall regarding how vote-by-mail records are used by law enforcement, debt collectors, and the CDC. Defendants counter

that challenges to Ribando's conclusions should go to the weight and not the admissibility of his claims.

Regarding the debt collection statement, Plaintiffs contend that Ribando's experience in law enforcement does not include collecting debts, and as a result, his opinions with respect to debt collection are improper as he can only "assume" as to their practices. (Pls. MTS Expert at 3; "Ribando Depo. Tr.," Dkt. No. 219-2 at 232:5-12.) The Court agrees with Plaintiffs that Ribando does not have expertise to render an opinion on creditors' practices of using voter data. At his deposition, Plaintiffs confronted Ribando with New York Election Law Section 3-103(5), which prohibits using information derived from voter registration records "for non-election purposes," N.Y. Elec. Law § 3-103(5), and New York Election Law Section 17-168, which makes "[a]ny person who knowingly and willfully violates [this] provision . . . guilty of a misdemeanor," N.Y. Elec. Law § 17-168. Ribando conceded that based on his reading of these laws, credit card collectors and other debt collectors would likely be prohibited from using voter registration data to collect outstanding debts. He further admitted that in his private investigation work, he had never been hired by a debt collector but "would assume they would . . . engage a private investigator to help them with debt collections." (Ribando

29

Depo. Tr. at 230:23-25, 231:2, 232:7-12.) His opinion on debt collector practices is thus unsubstantiated and primarily speculative as he does not have *direct* experience or knowledge of debt collection practices that would be helpful for the fact finder.

The Court recognizes, however, that in his Report, Ribando discusses at length the practice of skip tracing used by investigators to locate individuals, including debtors. He notes that typical skip tracing sources include voter registration data, citing an accounting website as support for that proposition. (Ribando Report at 3.) Ribando expounds on the difference in the accuracy of personal information obtained through vote-by-mail as opposed to in-person voting and explains that an investigator *prefers* vote-by-mail data. Notably, however, the accounting website indicating that skip tracing uses voter registration data does not make a distinction between vote-by-mail registration and in-person voter registration. There is no indication in Ribando's Report whether skip tracing programs or private investigators can isolate vote-by-mail data from all voter registration data and whether there will be heightened surveillance of mail-in voters, in particular, as opposed to an in-person

voter.[12] Thus, despite Ribando's extensive experience working
in law enforcement and at various levels of government, the
Court finds he is not properly qualified to render an opinion
on debt collector practices, and to that extent, his Report
is stricken.

Plaintiffs also argue that Ribando has no actual
experience with the CDC or the tracking of individuals for
"mandatory vaccines," rendering his opinion as to the CDC's
practices regarding their use of vote-by-mail records
improper. Defendants rebut that because Ribando served as the
former Deputy County Executive of Public Safety, he "would
*reasonably expect* that during a pandemic the Center for
Disease Control would use all available public records
(including voter registration records) to facilitate the
tracking of issues related to COVID-19, including the federal
government's mandatory vaccine requirements for its
employees." (Defs. Opp. to MTS Expert at 3 (emphasis added).)

The Court agrees with Plaintiffs that Ribando does not
have the requisite background to opine as to the CDC and their
practices. A review of Ribando's background reveals that his

---

[12] The Court notes that such a distinction is significant because
Defendants targeted vote-by-mail specifically, warning of dangers that
are supposedly unique to voting by mail. By deterring voters from voting
by mail only, Defendants could feasibly succeed in preventing them from
voting altogether -- without explicitly telling voters not to vote at all
-- because their only other alternative would be to vote in person and
risk contracting the COVID-19 virus.

position as the Deputy County Executive of Public Safety primarily involved providing high-level administrative oversight of different municipal departments, facility relocations, grant disbursements, property purchases, and event management. (Ribando Report at 8.) The Court does not find that his experiences in public safety have any consequential overlap with the subject matter at hand, which is whether the CDC will use vote-by-mail records to track for mandatory COVID-19 vaccinations. Thus, the Court finds he is not properly qualified to render an opinion on the CDC's practices, and to that extent, his Report is stricken.

Lastly, Plaintiffs contend that Ribando does not have the qualifications to render the opinion that the police will use the vote-by-mail data to "track down old warrants." To bolster their argument, and as discussed above, Plaintiffs note that when confronted with New York election law, Ribando conceded that the law does not expressly provide exceptions for private investigators, law enforcement, or the CDC to use voter registration data for non-election purposes. (Pls. MTS Expert at 3; Ribando Depo. Tr. at 233:11-234:7.) Further, when Plaintiffs challenged Ribando on his conclusion that the call is true and accurate, Ribando clarified that voter registration data is "one of 10,000 different things you use" to identify the whereabouts of an individual. (Ribando Depo.

Tr. at 236:16-17.) Plaintiffs argue that the police can look up publicly available voter information to the same extent as any other member of the public, which is not "the product of an expert's insight." (Pls. MTS Expert at 3-4.)

The Court acknowledges that Ribando is best suited to offer an opinion on the practices of law enforcement in New York, in contrast to other jurisdictions, including with respect to warrant enforcement. The Court further recognizes that skip tracing programs and law enforcement may use voter information, generally, to the extent that the information is available publicly and databases may aggregate such data to conduct searches of individuals. However, the Court does not find that one needs to be an expert to offer this piece of information, nor does the Court find that Ribando's Report and testimony are responsive to the issue of whether mail-in voting, in particular, was uniquely vulnerable to heightened surveillance and tracking by these institutions and entities, as the Robocall suggested. Moreover, the Court finds that this use of voter information is at odds with, at least, New York election law, which Ribando is unable to reconcile. While the Court recognizes that Ribando has significant experience with law enforcement, the Court finds that there is an "analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). To that

extent, while the Court finds Ribando may be qualified regarding this aspect of his expertise and does not strike this portion of his Report, the Court will weigh its probative value accordingly.

Plaintiffs also argue that Ribando is not qualified to offer an opinion that the Robocall is not intimidating because he has no relevant experience with voter intimidation.[13] Defendants maintain that Ribando's Report does not render a legal opinion but rather offers his experience with police investigative methods. They further contend that Ribando did not offer an opinion as to what constitutes intimidation but "merely opined that the Robocall was not intimidating." (Defs. Opp. to MTS Expert at 4.) The Court does not find that the distinction that Defendants try to make is meaningful. Ribando's opinion that the Robocall is not intimidating must be stricken as it is a legal conclusion reserved for the fact finder to decide. (See infra Section III.A.2.)

However, even if an opinion of that kind were admissible, Ribando does not have the requisite expertise to proffer such an opinion because he lacks any relevant expertise with election law or voter intimidation. Defendants argue that

---

[13] Plaintiffs also argue that Ribando's opinion that the Robocall is not intimidating is an improper legal conclusion, which the Court discusses in greater detail in the following section.

Ribando's opinion is offered to show that "he has encountered actionable intimidation in a criminal context." (Defs. Opp. to MTS at 4.) Under Federal Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by its tendency to mislead or confuse the issues. The Court finds that to be the case here. Intimidation in the criminal context differs from intimidation in the context of the VRA and the KKK Act. Per New York Penal Law Section 215.17, which Ribando specifically relies on, intimidation involves "[i]ntentionally caus[ing] *serious physical injury* to another person for the purpose of obstructing, delaying, preventing or impeding the communication by such other person . . . relating to a criminal transaction . . . ." N.Y. Pen. Law § 215.17(1) (emphasis added). This definition includes a force element, which is notably absent from the statutes at issue in this case. Ribando's application of the New York Penal Law definition of intimidation to the facts in this case is likely to confuse a fact finder who may rely on Ribando's opinion, conflate these different definitions, and produce an outcome inconsistent with the law at issue. Any probative value of Ribando's opinion of intimidation in the criminal context, which the Court finds there to be little of, is substantially

outweighed by the unfair prejudice that may result from admitting his opinion.

Thus, the Court shall exclude improper portions of Ribando's Report, allow any permissible opinions limited to his experience in New York, and weigh his testimony accordingly. See In re Golden, No. 16 Civ. 40809, 2022 WL 362913, at *14 (Bankr. E.D.N.Y. Feb. 4, 2022) (noting that "the Court may strike or disregard portions of expert testimony that state legal opinions and conclusions, and consider other, permissible, expressions of expert opinion that do not cross that line").

### 2. Improper Legal Conclusions

Plaintiffs further seek to strike both of Ribando's opinions on the grounds that they constitute legal conclusions, reserved for the Court to decide, and are therefore improper. In the Report, Ribando offers two primary opinions: (1) that the content of the Robocall regarding voting by mail, specifically with respect to the claims that law enforcement, debt collection agencies, and the CDC will utilize mail-in voting records in the manner described in the Robocall, is accurate and (2) that the Robocall itself is not intimidating.

Plaintiffs claim that the first opinion (that the Robocall statements are true) is used to support the second

opinion (that the Robocall is not intimidating) and that both
opinions are improperly proffered by Ribando under Rule 702
and <u>Daubert</u>.   That   the   Robocall   is   not   intimidating,
Plaintiffs argue, should be stricken as it goes to "the
central issue of this case," namely the question of "what
does and does not constitute intimidation -- particularly
voter intimidation under the Voting Rights Act, Section 11(b),
and 42 U.S.C. § 1985(3) of the Ku Klux Klan Act." (Pls. MTS
Expert at 2.) Plaintiffs note that such legal conclusions are
found in both the Report and his deposition testimony.[14]

Defendants counter that the purpose of Ribando's expert
report and testimony is "to corroborate that private and
public entities regularly use mail-in voting records to
locate and track individuals for myriad reasons" (Defs. Opp.
to MTS Expert at 3) and that the Report is responsive to the
Court's previous finding that the Robocall contained false
messages and that Defendants provided no credible evidence
supporting the statements made in the Robocall (<u>id.</u> at 2

---

[14] Plaintiffs identify specific instances in Ribando's Report and
deposition testimony in which Ribando opines on legal issues amounting to
legal conclusions. For example, in his Report, Ribando notes that "the
[R]obocall simply does not have [the] elements" for intimidation as
defined by the New York Penal Code. (Pls. MTS Expert at 2; Ribando Report
at 6.) He continues to opine that the purpose of the original criminal
KKK Act, from which the civil KKK Act was derived, was to "eliminate the
extralegal violence of the Ku Klux Klan." (Pls. MTS Expert at 2; Ribando
Report at 6.) In his deposition, Plaintiffs asked Ribando whether based
on his decades of experience in law enforcement, his "legal conclusion is
that [the Robocall] was not intimidating," to which Ribando replied
affirmatively. (Ribando Depo. Tr. at 185:2-6.)

(citing <u>NCBCP I</u>, 498 F. Supp. 3d at 467)). Further, Defendants contend that Ribando's Report does not render a legal opinion, but rather speaks to "the methodologies of police and warrant squads, and the tactics used by licensed investigators to track down debtors." (<u>Id.</u> at 2.)

Ribando's grounds for not finding the Robocall intimidating is that the Robocall "is true and accurate" as it "merely highlights some of the intrinsic infirmities of mail-in voting." (Ribando Report at 6.) He bases his opinion on his experience in law enforcement with investigating, locating, arresting, and prosecuting individuals found guilty of, among other things, intimidating their victims in a variety of criminal contexts. He further bolsters his claim by arguing that upon listening to and analyzing the Robocall, the Robocall "contain[ed] none of the hallmarks associated with intimidation." <u>Id.</u>

The Court disagrees with Defendants' contention that Ribando's remarks do not amount to legal conclusions. In this Circuit, along with other circuits, expert testimony expressing legal conclusions must be excluded. <u>See</u> <u>Hygh v. Jacobs</u>, 961 F.2d 359, 363 (2d Cir. 1992); <u>see</u> <u>also</u> <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is inadmissible."). The Court recognizes that "expert testimony

may help a jury understand unfamiliar terms and concepts." _Bilzerian_, 926 F.2d at 1294. However, "[i]ts use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." _Id._

While Defendants claim that Ribando "certainly did not render a legal opinion," a review of Ribando's Report reveals that Ribando unequivocally arrived at a legal conclusion. Ribando's conclusion goes to the heart of this litigation -- whether Defendants' conduct constitutes intimidation or an attempt at intimidation. In prior stages of this case, the Court analyzed the definition of intimidation and historical precedent involving voter intimidation, explored at length the First Amendment implications of proscribing intimidating speech and conduct, and examined the motivations of Defendants along with the impact of the Robocall on its recipients to determine whether their conduct constitutes intimidation. _See_ _NCBCP I_, 498 F. Supp. 3d at 477-86; _NCBCP II_, 512 F. Supp. 3d at 509-12. That the Robocall is not intimidating is a legal question that lies at the core of this action.

Furthermore, as Plaintiffs indicated, Ribando also provides his analysis of the Robocall in the context of the

New York Penal Law's definition of intimidation, concluding that the Robocall does not contain the elements for intimidation under the Penal Code. As the Court noted above, Ribando's reliance on the definition of New York Penal Law's definition of intimidation in the criminal context is wholly inappropriate because it includes a force element that is not present in the VRA or the KKK Act. The opinion thus not only embraces the ultimate legal question of the case but would also mislead the jury because it applies an improper definition of intimidation to the Robocall.

Finally, the Court does not find Ribando's opinion as to the truth of the claims made in the Robocall to be a legal conclusion. However, as the Court noted in the previous section, the Court strikes that opinion as improper on the basis that Ribando lacks the expertise to assess whether the statements are accurate. Thus, Plaintiffs' motion to strike Ribando's expert testimony is granted, in part, and denied, in part.

B. <u>MOTION TO STRIKE DEFENDANTS' LOCAL RULE 56.1 STATEMENT</u>

Plaintiffs move to strike Defendants' Local Rule 56.1 Statement. They contend that Defendants' Statement of Undisputed Material Facts required by Rule 56.1 should be stricken on two grounds: (1) Defendants' Rule 56.1 Statement was untimely filed, making it prejudicial; and (2) Defendants'

Rule 56.1 Statement and, consequently, their brief in support of their summary judgment motion, are filled with unsupported factual assertions. (See Pls. MSJ Opp. and MTS at 2-3.)

First, Plaintiffs argue that Defendants' Rule 56.1 Statement was untimely filed and therefore prejudicial because it was filed on August 4, 2022, nearly one week after the July 29, 2022 deadline, and the untimely filing was made without leave of the Court or Plaintiffs' consent. As a result, Plaintiffs had only half of the time allotted to respond to Defendants' Rule 56.1 Statement. Plaintiffs additionally argue that Defendants' Rule 56.1 Statement draws on Plaintiffs' Rule 56.1 Statement, which was filed on time, and that Defendants' brief fails to make a single relevant citation to their Rule 56.1 Statement, frustrating Rule 56.1's goal of "streamlining the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records." (Id. at 2 (citing Holtz, 258 F.3d at 74).)

Plaintiffs are correct that Defendants failed to seek leave of the Court to file their Rule 56.1 Statement after the due date. The Court also acknowledges that Plaintiffs were stretched for time as they were allotted only half of the time to file their counter-statement. However, Plaintiffs likewise did not file a request for an extension of time to

respond to Defendants' late Rule 56.1 Statement. Further, despite the reduced time, Plaintiffs were able to file a timely response to Defendants' Rule 56.1 Statement. Though the Court recognizes the hardship that Defendants placed on Plaintiffs by flouting the deadline, the Court is not persuaded that their untimely Rule Statement 56.1 so prejudiced Plaintiffs in their ability to file their counter-statement that striking Defendants' Rule 56.1 Statement in its entirety on this basis is warranted. See also Holtz, 258 F.3d at 73 ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

However, Plaintiffs also argue that Defendants' Rule 56.1 Statement should be stricken on the grounds that the statement and their supporting brief contain unsupported factual assertions, causing them to fall short of the substantive requirements of Rule 56.1, which requires that alleged facts be supported "with citation[s] to the admissible evidence of record." (Pls. MSJ Opp. and MTS at 3 (citing Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003)).) Plaintiffs note that in many instances, Defendants fail to make any citation to the record or make improper references to the allegations in Plaintiffs' Amended Complaint, which cannot constitute admissible evidence at the

summary judgment stage. Plaintiffs indicate that at other times, Defendants make assertions relying on "unexplained groupings of record citations," providing little guidance for Plaintiffs or the Court. (Id.)

Additionally, in their counter-statement in opposition to Defendants' Rule 56.1 Statement, Plaintiffs dispute or challenge the materiality of the facts contained in Defendants' Rule 56.1 Statement almost in their entirety and provide additional statements of undisputed fact supporting the denial of Defendant's motion for summary judgment. Defendants counter that their Rule 56.1 Statement and the Statement of Facts in their brief do cite the record, including deposition testimony, but concede that their brief does not cite to their Rule 56.1 Statement.

Upon review of Defendants' Rule 56.1 Statement and consideration of the parties' arguments, the Court agrees with Plaintiffs that Defendants' Rule 56.1 Statement falls short of satisfying Rule 56.1's substantive requirements. As Plaintiffs note, in certain instances, Defendants fail to provide any citations to the record, or the citations provided do not provide guidance for the Court. (See, e.g., Defs. Rule 56.1 Stmt. ¶¶ 2-4, 11, 20-21.) Further, Plaintiffs' counter-

statement reveals that many of the facts[15] contained in Defendants' Rule 56.1 Statement are disputed or immaterial, and thus should not be considered.

In this District, courts "have interpreted current Local Rule 56.1 to provide that 'where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.'" Holtz, 258 F.3d at 73 (citing Watt v. New York Botanical Garden, No. 98 Civ. 1095, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000)); see also Epstein v. Kemper Ins. Companies, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (finding it appropriate to "disregard[] any inappropriate portions of [a party's] submissions" and instead "rel[y] upon admissible evidence"); Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999) ("[R]ather than scrutinizing each line . . . and discussing whether they contain conclusory allegations, legal arguments, or hearsay . . . the [c]ourt . . . will only consider [] evidence that is admissible."). Because this Court has the discretion to only consider the evidence that is admissible, without needing to strike the entire statement, the Court will do so

---

[15] The only fact that Plaintiffs do not dispute in its entirety is Paragraph 3, which provides the actual language of the Robocall that was disseminated to the public. (Pls. Rule 56.1 CS ¶ 3.)

when considering Defendants' Rule 56.1 Statement to resolve the parties' respective motions for summary judgment. Any facts that are unsupported by the record, disputed, or immaterial will not be considered in deciding the motions. Accordingly, Plaintiffs' motion to strike Defendants' Rule 56.1 Statement is granted, in part, and denied, in part.

C.   CROSS MOTIONS FOR SUMMARY JUDGMENT

    1. Standing

    As a threshold matter, the Court must address whether Plaintiffs have standing to commence this action. In their summary judgment motion,[16] Defendants challenge the standing of the Individual Plaintiffs and NCBCP, a challenge they previously raised at the motion to dismiss and TRO stages of this litigation, respectively. See NCBCP II, 512 F. Supp. 3d at 515-16 (addressing standing of the Individual Plaintiffs); NCBCP I, 498 F. Supp. 3d at 469-72 (addressing standing of NCBCP).

    Under the "prior decision" rule of the law of the case

_____

[16] The Court notes that Plaintiffs argued in their motion to strike Defendants' Rule 56.1 Statement that Defendants failed to cite to the record to support their legal arguments in their motion for summary judgment, and as a result Defendants' motion should be denied. (See Pls. MSJ Opp. and MTS at 3.) Though the Court acknowledges that it may deny a motion for failure to cite to the undisputed facts in evidence, the Court will consider the arguments Defendants advance in their affirmative summary judgment motion and in their opposition to Plaintiffs' affirmative motion.

doctrine,[17] "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 1999) (internal quotation marks omitted). Courts should reconsider prior decisions only when presented with compelling circumstances, namely: "(1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009). Notably, however, the law of the case doctrine is discretionary, and it "does not limit a court's power to reconsider its own decisions prior to final judgment." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992).

Consistent with its prior holdings, the Court holds here at the summary judgment stage that both the Individual Plaintiffs and NCBCP have standing to bring this case. With the undisputed facts in evidence and when viewed in the light

---

[17] In addition to the prior decision rule, the law of the case doctrine includes another subsidiary rule -- the mandate rule. See United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001). Under the mandate rule, once an appellate court has decided an issue, a district court on remand is "under a duty to follow the appellate court's ruling on that issue. . . ." United States v. Tenzer, 213 F.3d 34, 40 (2d Cir. 2000) (citing United States v. Cirami, 563 F.2d 26, 32 (2d Cir. 1977))(internal quotation marks omitted).

most favorable to the non-moving party, Defendants' renewed standing challenge does not persuade the Court to find otherwise.

Article III, Section 2 of the U.S. Constitution requires that "anyone seeking to invoke federal jurisdiction . . . [must] have standing to do so." Crist v. Comm'n on Presidential Debates, 262 F.3d 193, 194 (2d Cir. 2001) (per curiam). Article III standing requires that a plaintiff show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). While Defendants bring the standing challenge, "[t]he party asserting jurisdiction . . . bears the burden of proof as to standing." Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin., 710 F.3d 71, 79 (2d Cir. 2013), as amended (Mar. 21, 2013) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). Moreover, "to defend against summary judgment for lack of standing, a plaintiff must set forth by affidavit or other evidence specific facts supporting standing, as is generally required under Rule 56." Id. (internal quotation marks and citation

omitted); see also Fed. R. Civ. P. 56(c). Further, "[w]hen . . . there are multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward." New York v. United States Dep't of Agric., 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020) (citing Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017); Massachusetts v. E.P.A., 549 U.S. 497, 518 (2007)).

Here, Defendants argue that neither the Individual Plaintiffs nor NCBCP suffered a concrete and particularized harm that would constitute an injury-in-fact. The Court notes that Defendants do not challenge the standing of Plaintiff-Intervenor, the State of New York, whose individual standing alone would be sufficient for this action with multiple plaintiffs to proceed. Nevertheless, the Court finds that both the Individual Plaintiffs and NCBCP have standing to bring this case.

a. Individual Plaintiffs

Defendants argue that the Individual Plaintiffs did not suffer an injury-in-fact as a result of Defendants' conduct. Defendants claim that each of the Individual Plaintiffs "concede that they were entirely undeterred by the Robocall, voted in the Election, and sustained no articulable injuries," and therefore suffered no injury-in-fact. (Defs. MSJ Brief at 7.)

In cases involving plaintiffs who received prerecorded phone calls, courts in this District, as well as in other districts, have held that receiving a robocall directly is sufficient to confer standing upon a plaintiff.[18] See, e.g., Leyse v. Lifetime Ent. Servs., LLC, 679 F. App'x 44, 46 (2d Cir. 2017) (finding an injury-in-fact where the record showed that defendant left a prerecorded voicemail message to which plaintiff later listened on an answering device where plaintiff resided).

Here, the evidentiary record demonstrates that all of the Individual Plaintiffs received and listened to the Robocall. (See Winter Decl. ¶ 4; Dkt. No. 242-3 at 26:12; Hart Decl. ¶ 3-4; Wolff Decl. ¶ 4; Slaven Decl. ¶ 4; Kennedy Decl. ¶ 4; Daniel Decl. ¶ 4; Sferes Decl. ¶ 4.) While Defendants dispute that Steinberg received the call directly, Steinberg testified at his deposition that he received the call. (Dkt. No. 242-3 at 26:12.) Furthermore, at the time the Robocall was disseminated, Steinberg lived with his partner,

---

[18] See also Zani v. Rite Aid Headquarters Corp., 246 F. Supp. 3d 835, 847 (S.D.N.Y. 2017) (concluding that plaintiff's receipt of a prerecorded phone call sufficed to establish Article III standing in a Telephone Consumer Protection Act case); Abante Rooter & Plumbing, Inc. v. Pivotal Payments, Inc., No. 16 Civ. 5486, 2017 WL 733123, at *6 (N.D. Cal. Feb. 24, 2017) (finding that the "vast majority of courts . . . have concluded that the invasion of privacy, annoyance and wasted time associated with robocalls is sufficient to demonstrate concrete injury"); Bell v. Survey Sampling Int'l, LLC, No. 15 Civ. 1666, 2017 WL 1013294, at *3 (D. Conn. Mar. 15, 2017) (concluding that a plaintiff "[a]nswering a single robocall," even without incurring a financial charge for the call, constituted an injury-in-fact).

Winter, who also received the call directly. (Winter Decl. ¶
7; Steinberg Decl. ¶ 4.) Thus, by receiving the Robocall,
each Individual Plaintiff suffered a harm sufficient to
constitute a concrete injury, conferring upon them standing
to bring this case.

Moreover, even if Steinberg did not receive the call
directly, as this Court established at the motion to dismiss
stage, the Individual Plaintiffs additionally suffered
emotional harm as a result of Defendants' conduct. Emotional
harm is sufficient to confer Article III standing upon a
plaintiff in these circumstances. See Denney v. Deutsche Bank
AG, 443 F.3d 253, 265 (2d Cir. 2006) (finding that "aesthetic,
emotional or psychological harms also suffice for standing
purposes"). The facts in the record, including the
accompanying declarations, which are undisputed, describe in
detail the type of emotional harm suffered by each Individual
Plaintiff.[19]

---

[19] For example, Winter found the Robocall "very scary and threatening"
considering that she planned to vote by mail due to the risk of exposure
to COVID-19 and believed that she now may need to vote in person. (Pls.
Rule 56.1 Stmt. ¶ 19.) For Steinberg, the Robocall was "particularly
traumatic" because he had a past nonviolent criminal conviction and was
planning to vote by mail, which the Robocall warned could result in law
enforcement tracking him down to arrest him. (Id. ¶ 20.) Defendants argue
that the statutes at issue do not protect plaintiffs like Steinberg who
have "delicate sensibilities." (Defs. MSJ Brief at 7.) However, as
Plaintiffs counter in their opposition, it was foreseeable that someone
with a prior conviction, such as Steinberg, would hear the call and suffer
emotionally because of the assertions made in the call. The fact that the
Robocall could -- and was designed to -- reach voters who might share

Defendants additionally argue that the Individual Plaintiffs could not have suffered an injury-in-fact because each Individual Plaintiff voted in the 2020 Election despite having listened to the Robocall. Plaintiffs correctly offer in rebuttal that ultimately voting in the election is not necessarily proof that the Individual Plaintiffs were not deterred. Winter and Steinberg, for example, initially planned to vote by mail but subsequently altered their plans and voted in person because of the Robocall. Further, the detail that the Individual Plaintiffs voted in the 2020 Election is not ultimately critical to the standing inquiry. As the Court held at the motion to dismiss stage, "the statutes at issue in this case do not proscribe only threatening and intimidating language that *successfully* prevents a person from voting." NCBCP II, 512 F. Supp. 3d at 516 (emphasis added); see 52 U.S.C. § 10307(b); 42 U.S.C. § 1985(3). The statutes also prohibit *attempts* to intimidate,

---

experiences or worries similar to those of Steinberg and induced such a response from its recipients lend credence to the insidious nature of Defendants' voter suppression operation. The facts further demonstrate that the remaining Individual Plaintiffs each suffered an emotional injury. Daniel felt "angry," "powerless," and "threatened" when she received the Robocall, making her apprehensive of answering her phone. (Pls. Rule 56.1 Stmt. ¶ 21.) Sferes had outstanding medical debt at the time she received the call and worried whether her information would be shared with debt collectors, causing her to feel "alarmed," "anxious," "angry," and "scared." (Id. ¶ 22.) Slaven felt angry and frustrated by the Robocall because it undid her efforts at getting out the vote in her community. (Id. ¶ 23.) Kennedy, Wolff, and Hart all indicated that they similarly felt upset, angered, infuriated, and irate because of the Robocall. (Id. ¶¶ 24-26.)

threaten, or coerce a person for voting or attempting to vote, and thus a violation of the VRA, the KKK Act, or the Civil Rights Act does not require that the intimidation actually succeed in preventing people from voting. (See infra Section III.C.2.) Accordingly, a plaintiff who was the target of such an attempt need not ultimately refrain from participating in the election to have suffered a legally cognizable injury.

Finally, Defendants argue that the Individual Plaintiffs lack standing under the KKK Act because they all identify as White and did not suffer racial discrimination. Their argument is unavailing. A violation of the "Support or Advocacy Clause" of Section 2 of the KKK Act, see 42 U.S.C. § 1985(3), which is the clause under which Plaintiffs are suing, does not require a showing of racial animus. (See infra Section III.C.3.) The Support or Advocacy Clause requires only that the target of the conspiracy be "an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections." NCBCP I, 498 F. Supp. 3d at 486-87. As discussed below, Defendants confuse the Support or Advocacy Clause of the KKK Act with the Equal Protection Clause, which does require a showing of discriminatory, class-based animus. As the Equal Protection Clause is not at issue here, the race of the Individual

Plaintiffs does not have any bearing on their standing to bring this action.

The Court finds that the remaining elements of Article III standing are also met. The injury of the Individual Plaintiffs is directly caused by Defendants' conduct, and Defendants conceded at the TRO hearing that they caused the Robocall to be distributed. (See TRO Hearing Tr. at 12:18-13:2, 15:15-21.) Though a but-for inquiry is not required to satisfy traceability, absent Defendants' sending out the Robocall, the Individual Plaintiffs would not have suffered their respective injuries. Further, by prevailing in this litigation, the Individual Plaintiffs' injuries would be redressed, as they would no longer be subject to Defendants' robocalls or similar calls infringing upon their right to vote in the future. Upon review of the undisputed facts in the record at the summary judgment stage, the Court finds that the Individual Plaintiffs have standing to bring this action.

b. NCBCP

Defendants additionally contest the standing of NCBCP, a challenge they previously raised -- and this Court rejected -- at the TRO stage. Organizations may establish standing in two ways: "(i) directly, based on an injury to the entity itself, i.e. organizational standing, or (ii) in the

organization's representative capacity, based on the injuries to its members, i.e. associational standing." Pen Am. Ctr., Inc. v. Trump, 448 F. Supp. 3d 309, 319 (S.D.N.Y. 2020) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)). An injury-in-fact to an organization may be demonstrated by showing that a defendant's actions caused "a 'perceptible impairment' of an organization's activities . . . ." Nnebe v. Daus, 644 F.3d 147, 157 (2d Cir. 2011) (citing Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993)). For example, an organization "divert[ing] money from its other current activities to advance its established organizational interests" would constitute a perceptible impairment. Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 110 (2d Cir. 2017); see also Moya v. U.S. Dep't Homeland Sec., 975 F.3d 120, 129-30 (2d Cir. 2020) (finding that an immigration organization spending additional time servicing clients as a result of defendant's conduct was an opportunity cost constituting a perceptible impairment); Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (finding standing where an organization suffered a "concrete and demonstrable injury to [its] activities" and experienced a "consequent drain on the organization's resources").

Here, the Court finds that NCBCP has organizational standing. Defendants argue that NCBCP lacks standing because

the pecuniary damages incurred by the organization -- roughly $160 -- as a result of the Robocall is "de minimus" and therefore "insufficient to establish a claim under either section 11(b) and the KKK Act." (Defs. MSJ Brief at 8.) The Court is not persuaded by this argument. As Plaintiffs counter, a pecuniary loss of $160 alone would be sufficient to confer standing upon NCBCP as "a loss of even a small amount of money is ordinarily an 'injury'" for standing purposes. Czyzewski v. Jevic Holding Corp., 580 U.S. 451, 463 (2017); see also McGowan v. Maryland, 366 U.S. 420, 424, 430 (1961) (finding that a fine of $5 plus costs was sufficient to establish standing).

Defendants next argue that NCBCP does not have standing because any damages the organization suffered are "self-inflicted". Relying on Clapper v. Amnesty Int'l., 568 U.S. 398, 416 (2013), Defendants contend that NCBCP took "voluntary action" based on "their misguided view about prospective harm," which is not sufficient to constitute an injury-in-fact for standing purposes. (Defs. MSJ Brief at 8.) The Court disagrees. In Clapper, the Supreme Court did not find standing where the respondents were incurring costs in anticipation of "non-imminent harm" that was not "certainly impending." 568 U.S. at 417, 422. The respondents argued that they suffered an injury-in-fact because their communications

with foreign contacts were reasonably likely to be intercepted by the government in the future. See id. at 410. However, the Supreme Court rejected this argument because the threatened injury was "highly speculative" and not "certainly impending." Id. Here, however, the harm had already occurred; the Robocall had already been disseminated to more than 85,000 phone numbers across the United States. BWR Metro Detroit, which NCBCP oversees, was running a Census 2020 outreach program at the time the Robocall was broadcasted. (Pls. Rule 56.1 Stmt. ¶ 18.) But upon learning of the Robocall and the disinformation it had spread, BWR Metro Detroit diverted staff and resources from its planned Census operation to respond to the harm that had already been perpetrated by Defendants, thereby incurring an opportunity cost. (Id.) In fact, NCBCP had to reallocate roughly "$10,000 to $20,000 worth of time, technological resources, and paid staff to respond to the robocall." (Pls. Add'l Rule 56.1 Stmt. ¶ 3.) This opportunity cost constitutes a "perceptible impairment" of NCBCP's activities, satisfying the injury-in-fact requirement. Nnebe, 644 F.3d at 157.

Accordingly, the Court finds that NCBCP has standing to pursue this action. Defendants' motion for summary judgment as to standing is denied.

2. Section 11(b) of the Voting Rights Act

Both parties move for summary judgment on Plaintiffs' Voting Rights Act claim. Plaintiffs argue that Defendants violated Section 11(b) of the VRA, which provides, in relevant part, that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." 52 U.S.C. § 10307(b).

As the Court determined in NCBCP I and NCBCP II, Section 11(b) of the VRA reaches beyond government actors, affording a private right of action. See NCBCP I, 498 F. Supp. 3d at 476; NCBCP II, 512 F. Supp. 3d at 509; see also League of United Latin Am. Citizens – Richmond Region Council 4614 v. Pub. Interest Legal Found. ("LULAC"), No. 18 Civ. 423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (holding that Section 11(b) reaches private conduct); Ariz. Democratic Party v. Ariz. Republican Party, No. 16 Civ. 3752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (noting "[t]he statute does not exclude a private right of action for injunctive relief"). The Court also determined that a showing of racial animus or discrimination is not required to establish a violation of Section 11(b). See NCBCP I, 498 F. Supp. 3d at 476-77; see also H.R. Rep. No. 89-439 (1965) ("House Report"), as reprinted in 1965 U.S.C.C.A.N. 2437, 2462 (noting that

"[t]he prohibited acts of intimidation need not be racially motivated").

a. Intimidate, Threaten, or Coerce

The crux of Section 11(b) and several of the other statutes at issue in this case is whether Defendants' conduct was intimidating, threatening, or coercive. Section 11(b) of the VRA requires showing that the defendant intimidated, threatened, or coerced someone for voting or attempting to vote, or attempted such intimidation, threats, or coercion.

There is no dispute that the message contained in the Robocall relayed to tens of thousands of residents throughout the states of New York, Pennsylvania, Michigan, Illinois, and Ohio to "beware of vote by mail," and that the exposure of voters' personal information through vote-by-mail could result in: (1) legal consequences, that law enforcement could use vote-by-mail information to make arrests; (2) economic consequences, that debt collectors could use this information to collect outstanding debts; and (3) physical consequences, that by collecting this information, the CDC will track individuals for mandatory COVID-19 vaccinations.

Plaintiffs argue that each of the alleged legal, economic, and physical consequences of voting by mail engendered by Defendants through the Robocall constituted intimidation, for they were unambiguous threats designed to

stop eligible voters, particularly Black voters, from exercising the right to vote, and that in the alternative, Plaintiffs are entitled to relief because Defendants *attempted* to threaten and intimidate voters.

In this case, the Court previously examined at length the conduct encompassed by the terms "intimidate," "threaten," and "coerce" under the statute. See NCBCP I, 498 F. Supp. 3d at 477; NCBCP II, 512 F. Supp. 3d at 509. The Court reviewed the dictionary definition[20] of each term, analyzed the statutory text, and surveyed relevant case law involving Section 11(b), similar voting rights statutes, and analogous civil rights statutes. At these prior stages, the Court determined that intimidation includes messages that a reasonable recipient, familiar with the context of the communication, would view as a threat of injury to deter individuals from exercising their right to vote. See NCBCP II, 512 F. Supp. 3d at 509. The Court explained that unlawful threats or intimidation under the statute need not be violent

---

[20] Relying on Webster's dictionary, the Court noted in its TRO Decision and Order that "[t]he words 'intimidate,' 'threaten,' and 'coerce,' have familiar and somewhat overlapping definitions. To 'intimidate' means to 'make timid or fearful,' or to 'inspire or affect with fear,' especially 'to compel to action or inaction (as by threats).' To 'threaten' means to 'utter threats against' or 'promise punishment, reprisal, or other distress.' And to 'coerce' means to 'restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence intimidation).'" NCBCP I, 498 F. Supp. 3d at 477 (internal citations omitted); see also NCBCP II, 512 F. Supp. 3d at 509.

or physical, and may include communications inspiring fear of legal consequences, economic harm, dissemination of personal information, and surveillance. See NCBCP I, 498 F. Supp. 3d at 477; NCBCP II, 512 F. Supp. 3d at 509.

Now, at the summary judgment stage, based on the facts in evidence, the Court remains persuaded that Defendants' conduct was intimidating, threatening, or coercive towards voters, especially Black voters, by warning of several specific and foreboding consequences of voting by mail. First, the Robocall states that "if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants . . . ." (Pls. Rule 56.1 Stmt. ¶ 4; Defs. Rule 56.1 Stmt. ¶ 3.) As this Court noted in previous stages of the litigation, courts have repeatedly held that conduct warning of negative criminal and legal consequences, including in the context of voting, can constitute intimidation.[21] Here, the warning in

---

[21] See, e.g., United States v. McLeod, 385 F.2d 734, 741-42, 747 (5th Cir. 1967) (holding that baseless or pretextual arrests and prosecutions constitute unlawful intimidation); United States v. Nguyen, 673 F.3d 1259, 1265 (9th Cir. 2012) (concluding that there was a fair probability that the wide distribution of a letter to Latino immigrants warning "that if they voted in the upcoming election their personal information would be collected" and could be provided to anti-immigration organizations constituted unlawful intimidation under California law); Damon v. Hukowicz, 964 F. Supp. 2d 120, 150 (D. Mass. 2013) (noting that "a threat of arrest would presumably qualify under the right circumstances as threats, intimidation, or coercion") (quoting Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009)); see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (holding that a jury could

the Robocall could easily be perceived as threatening or
intimidating to a reasonable recipient as it portends the
risk of arrest -- that the disclosure of a voter's personal
information through vote-by-mail will be used by law
enforcement to execute outstanding arrest warrants against
that voter. Such a message is particularly threatening to the
Black community given the well-documented and longstanding
history of racially discriminatory practices it has endured.[22]
Furthermore, this message was likely to engender confusion
about voting among those who have had previous interactions
with the criminal legal system. ("Grimmer Report,"[23] Dkt. No.
216-60 at 5.)

Indeed, the evidence shows that some voters perceived
the Robocall as threatening legal action if they voted by
mail. Steinberg, with a prior nonviolent conviction on his
record, was frightened by the call and relived his past trauma
related to the conviction. (See Steinberg Decl. ¶¶ 13-14; Pls.
Rule 56.1 Stmt. ¶ 20; Pls. MSJ Brief at 13.) Due to the
Robocall, Steinberg voted in person during the COVID-19

---

reasonably find that the threat of legal action violated the prohibition
on intimidation in the Americans with Disabilities Act).

[22] See, e.g. generally, Sarah A. Seo, POLICING THE OPEN ROAD (2019) (discussing
historically discriminatory policing practices).

[23] Because the Report of Plaintiffs' expert, Professor Justin Grimmer
("Grimmer"), does not have page numbers, the Court begins the page count
on the first page of the Report, excluding the exhibit cover page.

pandemic, despite his initial plans to vote by mail and went as far as to request that his name be removed from the voter roll as he feared how else his personal information might be used without his permission. (Pls. Rule 56.1 Stmt. ¶ 20.)

Second, the Robocall warns that a voter's personal information will "be used by credit card companies to collect outstanding debts." (Pls. Rule 56.1 Stmt. ¶ 4; Defs. Rule 56.1 Stmt. ¶ 3.) The Court has previously recognized and taken judicial notice of the history of discriminatory lending and debt collection practices in the Black community and does so again here. See NCBCP I, 498 F. Supp. 3d at 483 n.23; NCBCP II, 512 F. Supp. 3d at 515 n.7. The message pertaining to debt collection could instill fear in reasonable recipients of the call that credit card companies and other lenders will use vote-by-mail information to collect any outstanding debts, a clear threat of economic harm. Courts have held such threats of adverse economic consequences to be intimidating or threatening.[24]

---

[24] See, e.g., United States v. Bruce, 353 F.2d 474, 476-77 (5th Cir. 1965) (holding that a landowner's restriction of an insurance collector's access to the landowner's property due to the insurance collector's efforts to register voters constitutes unlawful intimidation); United States v. Beaty, 288 F.2d 653, 654-57 (6th Cir. 1961) (holding that the eviction of sharecroppers as punishment for voter registration constitutes unlawful intimidation); Katzenbach v. Original Knights of Ku Klux Klan, 250 F. Supp. 330, 356 (E.D. La. 1965) (finding that economic coercion constituted intimidation).

Here, plaintiff Andrea Sferes who had outstanding medical debt at the time that she received the Robocall, felt alarmed and anxious after hearing the message as she believed that debt collectors might act after obtaining her information through vote-by-mail. A reasonable jury could find that the message and its impact on the Individual Plaintiffs demonstrate that the Robocall was intimidating by threatening adverse economic consequences to voters who planned to vote by mail.

Finally, the Robocall warned that "[t]he CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines." (Pls. Rule 56.1 Stmt. ¶ 4; Defs. Rule 56.1 Stmt. ¶ 3.) When viewed within a larger historical context, the message can be seen as a reminder of a dark history of forced medical experimentation on the Black community. (Grimmer Report at 6; "Hancock Alfaro Report," Dkt. No. 216-61 at 5.) At the time this message was delivered, there was public uncertainty and skepticism towards the yet-unavailable COVID-19 vaccines, including questions about their safety, efficacy, and administration. Thus, an ordinary recipient of the Robocall, hearing that the CDC would use vote-by-mail records to track voters in order to administer mandatory vaccines, would likely find such a warning to be

threatening bodily harm,[25] in turn having a chilling effect on voting. A reasonable jury could thus find that the message threatened bodily harm if people voted by mail.

An overarching threat that looms throughout the Robocall is the danger that a voter's private information will become exposed if that person votes by mail. Voter privacy, as the amicus brief submitted by EPIC explains, is vital to election integrity. The secret ballot is such a fundamental part of elections throughout the United States that the failure to maintain voter privacy in some jurisdictions could lead to declaring that election null and void. (See EPIC Amicus at 4-5.) Underpinning the legal, economic, and bodily consequences that Defendants articulated through the Robocall was the notion that voting by mail put voters at risk of increased surveillance and scrutiny, exposing their private data to any entity seeking to utilize that information in nefarious ways.

Additionally, when viewing the entire Robocall operation in context, the Court is further persuaded that Defendants' conduct constitutes voter intimidation and that their defense of their statements as mere political opinion is disingenuous.

---

[25] The Court recognizes that forced vaccination may not only qualify as "an invasion of bodily integrity," but also an infringement upon one's expectation of privacy. Missouri v. McNeely, 569 U.S. 141, 148 (2013); see also Skinner v. Ry. Lab. Execs. Ass'n, 489 U.S. 602, 616 (1989) ("[P]hysical intrusion, penetrating beneath the skin, infringes an expectation of privacy.").

The emails exchanged between Wohl and Burkman, the ACPI Prospectus describing Wohl's voter suppression plan, and the features of the Robocall making it appear legitimate, such as its claim that it was being made from a civil rights organization, demonstrate that the Robocall was a calculated attempt to deter Black voters by exploiting fears and stereotypes, and not merely the expression of an opinion.

Defendants argue that the Robocall was not intimidating because the Individual Plaintiffs were "not intimidated or harmed in any way" by the Robocall. (Defs. MSJ Brief at 29; Defs. MSJ Opp. at 16.) However, the undisputed evidence in the record, including the affidavits of the Individual Plaintiffs and their respective deposition testimony, does not support Defendants' interpretation of the Individual Plaintiffs' reactions to the call. As Plaintiffs note, Defendants concede that the Individual Plaintiffs were inconvenienced or irritated by the call. The full record shows that the Individual Plaintiffs were frightened, enraged, and distressed upon receiving the call, with some plaintiffs like Steinberg and Sferes reliving their past traumas or feeling especially targeted by the call. That the Robocall induced these feelings of fright, rage, and distress confirms that the Individual Plaintiffs were in fact intimidated and threatened by the message.

Equally unavailing is Defendants' argument that the call was not intimidating because none of the Individual Plaintiffs were deterred from voting nor spoke with anyone in the Black community. (Defs. MSJ Opp. at 16.) However, whether the Individual Plaintiffs ultimately voted or spoke to Black voters is immaterial to a Section 11(b) analysis. As Plaintiffs argue, and as the Court explained above (see supra Section III.C.1), an *attempt* to intimidate, threaten, and coerce others -- regardless of race -- for exercising their right to vote, even if ultimately unsuccessful, still violates Section 11(b). See United States v. Clark, 249 F. Supp. 720, 728 (S.D. Ala. 1965) ("The success or failure of intimidation, threats or coercion, is immaterial, since 'attempts' are equally proscribed.").

Defendants also advance the argument that they lacked the intent to intimidate, threaten, or coerce others from exercising their right to vote, and thus could not have violated Section 11(b). They rely on Arizona Democratic Party v. Arizona Republican Party and United States v. Nguyen for the proposition that the intimidation must be *intentional* for there to be a statutory violation. However, these cases do not support Defendants' intent argument. In Arizona Democratic Party, the district court noted that though it need not decide the issue, it agreed with the plaintiff that

the language of Section 11(b) did not have a particular *mens rea* requirement. See 2016 WL 8669978, at *4 n.3. In Nguyen, the statute at issue was a California voting rights statute that expressly prohibits the intentional intimidation of voters, unlike the statute at issue here. See Nguyen, 673 F.3d at 1265. This Court considered Nguyen at the TRO and motion to dismiss stages for its analysis on intimidation, and not on intent or the California statute as a whole. See NCBCP I, 498 F. Supp. 3d at 482-84; NCBCP II, 512 F. Supp. 3d at 509-11.

Moreover, this Court previously established that Section 11(b) of the VRA does not have an explicit intent requirement. See NCBCP I, 498 F. Supp. 3d at 480; see also LULAC, 2018 WL 3848404, at *3-4 (finding Section 11(b) does not have a specific intent requirement and that the omission of "for the purpose of" in the statutory text suggests that Section 11(b) has a "deliberately unqualified reach" compared to Section 131(b) of the Civil Rights Act). That no intent need be shown is evident not only in the statutory text but also in the VRA's legislative history. Congress omitted the phrase "for the purpose of" to broaden the reach of the VRA. (Protect Democracy Amicus at 4.) And in the House Report, then-Attorney General Nicholas Katzenbach testified that excluding a *mens rea* requirement was part of the design of the VRA. (See id.

at 4-5 (indicating that Katzenbach noted that "no subjective 'purpose' need be shown . . . in order to prove intimidation under [Section 11(b)]. Rather, defendants would be deemed to intend the natural consequences of their acts.").)

In further support of their argument that intent is an element of a Section 11(b) claim, Defendants highlight that "several Plaintiffs . . . republished the allegedly offensive Robocall by either replaying it or by distributing it electronically" (Defs. MSJ Brief at 30), but because Plaintiffs lacked the intent to intimidate, their conduct is not actionable under Section 11(b). The Court finds that Defendants' argument lacks merit. As this Court previously held, and as Plaintiffs argue in rebuttal, the communication must be viewed in its proper context to determine whether such conduct violates Section 11(b). For example, Winter, who allegedly republished the Robocall did so to inform others about the existence of the Robocall and its "fear-mongering" tactics to suppress voting. (Dkt. No. 242-10.) When viewed under those circumstances, it is clear that Winter did not intimidate or threaten others from voting, nor attempted to do so, but was rather informing others about the existence of the Robocall and the disinformation that was being broadcasted to potential voters.

To that end, even if a showing of intent were required under Section 11(b), which it is not, that element is easily satisfied. That Wohl and Burkman intended to suppress voter turnout in the 2020 Election through intimidation tactics is clear from the emails exchanged between Defendants both in the days leading up to the launch of the Robocall and in the aftermath of the operation in which they rejoiced at the angry calls they received from Black recipients of their scheme. Defendants deliberated and reflected on their choice of cities and states to which they would disseminate the Robocall, settling on "black neighborhoods" and ultimately disseminating the call to cities with significant Black populations, all for the purpose of deterring voters -- in particular Black, Democratic voters -- from voting in the 2020 Election. They utilized combative language when developing their Robocall strategy, referring to their plan as a "HIJACK[ing]" of the election and an "attack." (Pls. Rule 56.1 Stmt. ¶¶ 6, 8.) And though it was drafted more than a year before the Robocall operation was effectuated, the ACPI Prospectus foretold at least Wohl's plan to disrupt the 2020 Election by deterring Democratic voters, which was later narrowed to Black voters. (ACPI Prospectus at 2, 13.) Launching and broadcasting the Robocall resulted in voter intimidation, and as the Court previously noted, "normally,

a person is presumed to have intended the natural consequences of his deeds." NCBCP I, 498 F. Supp. 3d at 485 (citing Washington v. Davis, 426 U.S. 229, 253 (1976) (Stevens, J., concurring)) (internal quotation marks omitted). Even though intent is not an element of a Section 11(b) violation, a reasonable jury could find that Defendants intended to intimidate and threaten voters for exercising their right to vote.

In sum, Defendants' arguments do not create a dispute of material fact to overcome summary judgment. Defendants, by broadcasting the Robocall, intimidated or attempted to intimidate others from voting, and caused the Robocall's recipients to feel intimidated or threatened if they voted by mail, which then impacted the course of action certain individuals took during the 2020 Election. At best, Defendants rely on the Report of their proffered expert Charles Ribando to overcome Plaintiffs' motion. But as discussed above, the Ribando Report includes testimony that this Court finds is largely inadmissible. Defendants offer Ribando's Report as evidentiary support for their conclusion that the statements in the Robocall are true and therefore not intimidating. The Report concluded that "the Robocall contains none of the hallmarks associated with intimidation[]" (Ribando Report at 6) and is "substantially true and accurate,

not in any way designed to have a suppressive effect, and devoid of any intimidation, threat, or coercion" (id. at 7). As the Court held above, Ribando lacks the qualifications to make such assertions as to the truth of the Robocall's claims, and his opinion constitutes an improper legal conclusion that must be stricken from the record. His opinions, therefore, do not influence the Court's decision.

  b. First Amendment Defense

  The heart of Defendants' motion for summary judgment in seeking to dismiss the VRA claim, along with the KKK Act claim, is their First Amendment defense. Defendants argue that their conduct constitutes protected political speech. The Court previously considered and rejected Defendants' First Amendment argument, including at the motion to dismiss stage. See NCBCP II, 512 F. Supp. 3d at 512-15. Here, Defendants have again failed to persuade the Court that their conduct constitutes speech entitled to First Amendment protection.

  i. Unprotected Speech

  Defendants argue that their communication does not step beyond the bounds of protected speech. Section 11(b) of the VRA, along with Section 2 of the KKK Act, discussed below, is a content-based restriction as it limits speech "based on the message a speaker conveys." Reed v. Town of Gilbert, 576 U.S.

155, 163 (2015). Section 11(b), along with Section 2 of the KKK Act, specifically proscribes speech that intimidates or threatens voters or attempts to intimidate or threaten voters for exercising their right to vote. Such content-based restrictions on speech are subject to strict scrutiny. See id. However, certain types of speech are not entitled to First Amendment protection. See Watts v. United States, 394 U.S. 705, 708 (1969). Among these are "true threats."[26] Id.

At prior stages of the litigation, the Court held that the statements made by Defendants constituted "true threats," which are not entitled to First Amendment protection. A true threat is speech that "an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret [] as a threat of injury." United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013); see also NCBCP I, 498 F. Supp. 3d at 478. Such threats can be proscribed "even where the speaker has no intention of carrying them out." Turner, 720 F.3d at 420. Courts have also recognized the amorphous shape that a threat can take, acknowledging that it need not be conveyed in an explicit or direct manner. The Second

---

[26] Other exceptions include speech directed at and likely to incite imminent lawless action, see Bradenburg v. Ohio, 395 U.S. 444, 447 (1969) (per curiam); child pornography, see New York v. Ferber, 458 U.S. 747 (1982); obscenity, see Miller v. California, 413 U.S. 15 (1973); and fighting words, see Chaplinsky v. New Hampshire, 315 U.S. 568 (1942).

Circuit noted that if courts were required to "rigid[ly] adhere[] to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience," prohibitions on true threats would essentially be "powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Id. at 422 (quoting United States v. Malik, 16 F.3d 45, 50 (2d Cir. 1994), and citing United States v. Shoulberg, 895 F.2d 882, 886 (2d Cir. 1990)).

Additionally, such a threat need not be physical or violent, as non-physical injury likely falls within the purview of a "true threat." See Virginia v. Black, 538 U.S. 343, 359 (2003); Turner, 720 F.3d at 420. In Virginia v. Black, the Supreme Court determined that "[t]rue threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence." 538 U.S. at 359 (emphasis added and internal quotation marks omitted). The Supreme Court in Black further noted that prohibitions on true threats seek to "protect[] individuals from the fear of violence and the disruption that fear engenders, as well as from the possibility that the threatened violence will occur." Id. at 360 (emphasis added). Thus, in Black, the Supreme Court did

not expressly restrict true threats to only threats of physical harm. As this Court previously noted, the Second Circuit in Turner determined that a communication constitutes a true threat if a reasonable recipient "would interpret [the message] as a *threat of injury*,"[27] 720 F.3d at 420 (emphasis added), without expressly limiting it to threats of physical violence. See also NCBCP I, 498 F. Supp. 3d at 479-80. This Court thus finds that a threat of nonviolent or nonbodily harm can also constitute a "true threat" that is excepted from First Amendment protection.

Defendants argue that their speech is "not captured by any of the categorical exceptions to the First Amendment" (Defs. MSJ Brief at 20) because their conduct is political speech, falling "outside the parameters of the 'true threat' exception to First Amendment" (id. at 25). Defendants argue that their speech is political because it consists of "informed opinions of mail-in voting" (id. at 10), rendering it a "matter of public concern" (id. at 11). The Court disagrees.

---

[27] The Turner court also cited constitutional law scholar and legal philosopher Kent Greenawalt for the proposition that a legislature can criminalize "threaten[ing] a specific legal wrong grave enough to be likely either to cause substantial emotional disturbance . . . or to require the employment of substantial resources for investigation or prevention." Turner, 720 F.3d at 420 (quoting Kent Greenawalt, Speech, Crime and the Uses of Language 91 (1989)).

As the Court found in prior postures, Defendants'
messages overstep their bounds as mere "political speech" and
cross into the territory of conduct constituting true threats.
The Robocall, that is, the speech at issue, put a reasonable
recipient familiar with the context of the Robocall in fear
that an injury of a legal (arrest), economic (debt collection),
or physical (mandatory vaccination) nature would occur if the
recipient voted by mail. The message signaled that voters'
personal information would become available to government
entities and other institutions to track and surveil them.
The message concluded by warning its recipients to "beware of
vote by mail." (Pls. Rule 56.1 Stmt. ¶ 4; Defs. Rule 56.1
Stmt. ¶ 3.) The only reasonable interpretation of these
statements is that they were designed to instill fear of
voting by mail in potential voters, portending adverse
consequences in order to induce a chilling effect so as to
deter mail-in voting, or perhaps voting entirely. Despite
Defendants' protestations that their conduct is not
"unprotected speech," the undisputed evidence shows that
their communication constitutes a "true threat."

Defendants also argue that though their statements are
true, even if the Court found the statements to be false,
their speech would still be entitled to First Amendment
protection. The Court does not agree. In United States v.

_Alvarez_, the Supreme Court addressed the level of scrutiny that applies to false statements. 567 U.S. 709 (2012). In _Alvarez_, where the Supreme Court issued a fragmented plurality decision, Justice Breyer's concurrence noted that when false statements are "about easily verifiable facts," a reviewing court should apply intermediate scrutiny to assess whether the false statements are protected under the First Amendment. 567 U.S. at 732 (Breyer J., concurring in the judgment). This guidance can also apply where "such lies are most likely to cause harm" or comprise "information dissemination." _Mackey_, 2023 WL 363595, at *20 (citing _Alvarez_, 567 U.S. at 738 (Breyer, J., concurring in the judgment)). Justice Breyer's concurrence in _Alvarez_ distinguishes facts that are easily verifiable from "false statements about philosophy, religion, history, the social sciences, the arts, and the like," which would conversely call for strict scrutiny. _Alvarez_, 567 U.S. at 731. Though _Alvarez_ does not command a majority, the plurality and Justice Breyer's concurrence agree that "false factual statements that cause legally cognizable harm tend not to offend the Constitution." _Mackey_, 2023 WL 363595, at *21 (citing _Animal Legal Defense Fund v. Kelly_, 9 F.4th 1219, 1232 (10th Cir. 2021) (citing _Alvarez_, 567 U.S. at 719; _id._ at 734-36 (Breyer, J., concurring in the judgment))).

Here, the Court has already determined that because the messages constitute true threats, they are not entitled to First Amendment protection. However, even if it were not the case, the proscription of Defendants' false speech would still be permissible because it survives the intermediate scrutiny analysis. The Court first establishes that the statements in the Robocall are false. In arguing that their statements are true or "truthy," Defendants cite the Report prepared by their expert, Ribando. Above, the Court found that Ribando's opinions regarding the veracity of the statements in the Robocall were largely unfounded or did not squarely establish whether the statements in the Robocall were true or false.

The expert reports provided by Plaintiffs, including the Report of Kellner, the Commissioner of the New York State Board of Elections, and of Grimmer, Professor of Political Science at Stanford University, support a reasonable finding that the statements in the Robocall are false. Kellner opines that New York Election Law Section 3-103(5) prohibits using voter registration information for "non-election purposes," N.Y. Elec. Law § 3-103(5), and declares that in New York, "there is no database that police departments, credit card companies, the Centers for Disease Control, or anyone else may access to show voters who used or applied for absentee

ballots for any purpose other than the conduct of elections."
(Kellner Decl. ¶ 22; Kellner Report at 3.) Further, Grimmer
maintains in his Report that there is "no evidence that voting
by mail exposes individuals to increased police attention,"
that it "increases an individual's risk of credit card
collections," or that it "would be used by the CDC for
mandatory vaccinations," all of which is corroborated by the
New York State Board of Elections. (Grimmer Report at 5-6.)
Beyond offering Ribando's Report, Defendants fail to provide
compelling evidence to counter[28] Plaintiffs' experts' claims
that the statements in the Robocall are false, and therefore
fail to raise a genuine dispute of material fact as to this
issue.

As the statements at issue are easily verifiable, the
restriction of such messages would thus be subject to
intermediate scrutiny. To survive intermediate scrutiny,
there must be a "fit" between the statute as applied and the
government's interest in regulating the speech. Mackey, 2023

---

[28] The Court notes that in their summary judgment motion, Defendants do
challenge certain statements in Grimmer's Report, specifically regarding
the attribution of the Arlington Center for Political Intelligence with
Defendants; the comparison of Defendants' Robocall strategy to those of
Russian intelligence agencies in the 2016 presidential election; and the
conclusion that the Robocall would likely confuse voters and deter them
from voting. (See Defs. MSJ Brief at 21.) However, these arguments are
unpersuasive and without factual support. Further, Defendants do not
dispute Kellner and Grimmer's contention that the vote-by-mail statements
in the Robocall are false.

WL 363595, at *24 (citing <u>Alvarez</u>, 567 U.S. at 731-32). Even if this Court did not find the speech at issue to be a "true threat," falling outside of the protection of the First Amendment, the VRA may still regulate the speech here, as applied. The VRA was a product of the Civil Rights Movement, and a conscious effort "to realize the constitutional guarantee of the Fifteenth Amendment that the right to vote shall not be denied 'on account of race or color.'" <u>NCBCP I</u>, 498 F. Supp. 3d at 475 (citing House Report at 2439). Section 11(b) seeks to protect against voter intimidation. While only a significant state interest need be shown under an intermediate scrutiny analysis, here, the federal government and the State of New York have an interest in protecting voting rights and maintaining "the integrity of [the] election process," rising to the level of a compelling interest. <u>Burson v. Freeman</u>, 504 U.S. 191, 206, 208 (1992) (recognizing that the government has a "compelling interest in securing the right to vote freely and effectively" and "in preventing voter intimidation and election fraud"); <u>Eu v. San Francisco Cnty. Democratic Cent. Comm.</u>, 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); <u>Silberberg v. Bd. of Elections of New York</u>, 272 F. Supp. 3d 454, 473 (S.D.N.Y. 2017) (recognizing a "compelling

government interest [in] preventing vote buying and voter intimidation").

Further, the Court finds that there is a fit between the application of Section 11(b) to Defendants' Robocall and the government's interest in regulating the speech. Defendants' false utterances in the Robocall were made in order to intimidate or threaten voters who were exercising their right to vote. This statute is narrowly tailored to ensure that mistaken false utterances are not penalized because the context of the speech itself is critical to determining whether speech is intimidating, threatening, or coercive to voters. As Defendants themselves pointed out, recipients of the call, such as Winter, who played the Robocall to another voter, are not in violation of Section 11(b) despite the Robocall containing false statements because the context indicated that Winter did not intimidate or threaten or attempt to do so.

The same cannot be said of Defendants. Kellner noted in his Report that the false utterances in Defendants' Robocall "had the capacity to undermine all of the [election] reforms and emergency measures" undertaken by the State of New York. (Kellner Report at 7.) Similarly, Grimmer explains in his Report that the disinformation in the Robocall can "increase doubt in electoral institutions and mistrust in election

results." (Grimmer Report at 6.) Thus, proscribing this election disinformation is tied to the government's interest in protecting voting rights and the integrity of elections. The statute as applied is narrowly tailored to serve the state's not only significant but compelling interest. Accordingly, the Court finds that restricting Defendants' speech survives intermediate scrutiny.[29]

### ii. Rhetorical Hyperbole

Defendants also argue that their communication is fully protected under the First Amendment because it constitutes "rhetorical hyperbole" on a matter of public controversy. (Defs. MSJ Brief at 15.) The Court recognizes that the free exchange of ideas on issues of public concern and the ability to engage in robust political discussion constitute the foundations of a democratic society. Though courts have tread cautiously when imposing restrictions on political speech,

---

[29] The Court also finds that the proscription of Defendants' expressions would survive a strict scrutiny challenge. As the Court noted, even if Defendants' conduct constituted "political speech," such speech can still be proscribed under a First Amendment strict scrutiny analysis. See Citizens United v. Federal Election Comm'n, 558 U.S. 310, 340 (2010) (holding that "[l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest") (internal quotation marks omitted). The Court noted at the TRO stage, that the content-based restrictions imposed by the VRA are narrowly tailored to advance compelling government interests. See NCBCP I, 498 F. Supp. 3d at 486 n.29. The statute, as applied to Defendants' utterances, is constitutional as it serves a compelling government interest in preventing voter intimidation and protecting election processes, and is the least restrictive means in serving that interest, as it does not restrict any more speech than necessary to achieve the government's objectives.

content-based restrictions of political speech have been permitted if they survive strict scrutiny. See Mackey, 2023 WL 363595, at *21 (citing Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734 (2011)). However, speech that "is not *political* in nature and is instead related to politics only in so far as it proscribes the procedures governing elections," have not been subject to such rigorous scrutiny. Id. at *22 (emphasis in original). Defendants claim here that they "disseminat[ed] a Robocall in the advocacy of a politically controversial viewpoint," which is "the essence of First Amendment expression." (Defs. MSJ Brief at 16-17.) Specifically, they claim that "mail-in voting has staked a place at the very center of this Nation's political discourse," and is debated by "[p]oliticians, journalists, academics, and ordinary Americans." (Id. at 17.) Thus, they argue that rhetorical hyperbole on such an issue of public controversy is permitted under the First Amendment.

The Court recognizes that political hyperbole even when "crude," "abusive, and inexact" is protected speech. NCBCP I, 498 F. Supp. 3d at 479 (citing Watts, 394 U.S. at 708). However, the Court is not persuaded by Defendants' characterization of mail-in voting. Defendants' "discourse" around this subject is a message that explicitly misleads voters about a particular method of voting in an attempt to

suppress the vote. They communicate that certain harms will occur if one votes by mail in a deliberate effort to deter Black voters from participating in the election. The subject of mail-in voting is not inherently political, as it is not related to the actual substance of what may be found on a ballot, such as public policy issues, candidate backgrounds and positions, or other pieces of legislation. Instead, mail-in voting is about election procedures and administration, and Defendants' discourse around it embodies an attempt to disturb the election process itself.[30] See generally, Mackey, 2023 WL 363595, at *23 (noting that "political speech cases have uniformly involved speech and expressive conduct relating to the *substance* of what is (or may be) on the ballot" rather than "attempts to protect access to the ballot") (emphasis in original).

The Court analyzed Defendants' communications above and found the speech to be a "true threat," which is exempted from First Amendment protection, and not hyperbole. The key

---

[30] Defendants also argue that their prior conduct shows that the Robocall is protected political speech. They liken the Robocall to another robocall they disseminated in which they encouraged Black voters to vote for hip hop artist Kanye West (the "Kanye Robocall") in the 2020 Election and for which they were not prosecuted. (See Defs. MSJ Opp. at 11-12.) They contend that the Robocall at issue here is no different from the Kanye Robocall and should receive the same treatment. The Court does not find that these two robocalls are similar. The Kanye Robocall at its core is about political candidates and their platforms, while the Robocall in this litigation is about election processes, taking it beyond the scope of political speech. The Court thus finds that Defendants' prior conduct argument is without merit.

to distinguishing "true threats" from "mere hyperbole or common public discourse" is context. Turner, 720 F.3d at 421; NCBCP I, 498 F. Supp. 3d at 479. For example, in Watts, the Supreme Court held that a particularly violent verbal utterance was political hyperbole, subject to First Amendment protection. Watts, 394 U.S. at 706. There, a war protester attended an anti-war rally and said, "If they ever make me carry a rifle, the first man I want to get in my sights is L.B.J." Id. In holding that the speech was hyperbole and not a true threat, the Supreme Court considered the context in which the speech was made, specifically that the statement was expressly conditional and that the crowd responded with laughter after the assertion was uttered. Id. at 707-08.

Here, despite Defendants' attempts to paint themselves as "goofballs and political hucksters with an irreverent sense of humor" (Defs. MSJ Brief at 2) to lessen the seriousness of the call, nothing in the record or in the context of Defendants' communications, suggests that the Robocall was "mere hyperbole." In addition to the specific harms that the call threatened, Defendants dressed the call with a veil of legitimacy to mislead its listeners into believing the statements made in the call were true. The Robocall framed Wohl and Burkman's organization, Project 1599, as a "civil rights organization" with a name reminiscent of

the 1619 Project, an initiative of the *New York Times* that sought to recognize and commemorate the history of the first slave ship that carried enslaved Africans into the United States. (Hancock Alfaro Report at 3.) Defendants created the persona of a Black activist, using the name Tamika Taylor, a name that has been mistakenly used by mainstream media outlets to refer to Tamika Palmer, the mother of Breonna Taylor.[31]

The call markedly lacked any outlandish details or other cues that may indicate to an ordinary listener that it should not be taken seriously. Indeed, that observation is reinforced by the Individual Plaintiffs, whose reactions to the Robocall demonstrate that it was not perceived as hyperbolic. Some of the Individual Plaintiffs, such as Sferes and Steinberg, were troubled by the call, and feared that voting by mail would negatively impact them for they had medical debt and a prior criminal conviction, respectively. NCBCP's BWR Metro Detroit also responded to the call seriously. Recognizing the harmful impact the call could have had on its

---

[31] Breonna Taylor was a Black woman who was shot and killed by police in her home in Louisville, Kentucky, and whose harrowing story was centered in public discourse and racial justice movements on discriminatory policing and systemic racism. The Court previously took judicial notice that Tamika Palmer, Breonna Taylor's mother, is a well-known civil rights activist and does so again here. See NCBCP I, 498 F. Supp. 3d at 467 n.9; see generally Brakkton Booker, Breonna Taylor's Mother: "I Won't Go Away. I'll Still Fight," NPR (Sept. 18, 2020), https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/09/18/914164312/breonna-taylors-mother-i-won-t-go-away-i-ll-still-fight.

community members, BWR Metro Detroit diverted resources from its Census outreach project to respond to this issue. It is thus disingenuous for Defendants to characterize their conduct as "rhetorical hyperbole," when the facts establish that the Robocall was broadcasted as a threat to deter Black voters from participating in the 2020 Election and its listeners interpreted it as such.

For these reasons, Defendants' First Amendment defense fails. Accordingly, the Court finds that Plaintiffs are entitled to summary judgment on their claim that Defendants violated Section 11(b) of the VRA and denies Defendants' motion for summary judgment to dismiss this claim.

### 3. Section 2 of the KKK Act

Both parties seek summary judgment on the claim that Defendants violated Section 2 of the KKK Act, specifically the "Support or Advocacy Clause." The Support or Advocacy Clause is violated when two or more individuals conspire:

> to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and

exercising any right or privilege of a citizen of the
United States.

42 U.S.C. § 1985(3). This clause specifically sought to
proscribe conspiracies interfering with federal elections.
(See Protect Democracy Amicus at 13-14.) The elements of a
Support or Advocacy Clause violation under Section 2 of the
KKK Act are: "(1) a conspiracy; (2) the purpose of which is
to force, intimidate, or threaten; (3) an individual legally
entitled to vote who is engaging in lawful activity related
to voting in federal elections." NCBCP I, 498 F. Supp. 3d at
486-87.

   a. Racial Animus

   Defendants argue that Section 2 of the KKK Act requires
a showing of discriminatory intent or purpose and that
Plaintiffs have failed to establish racial animus. Defendants
rely on the Supreme Court decision in Bray v. Alexandria
Women's Health Clinic for the proposition that to prove a
violation of the KKK Act, a plaintiff must show that "some
racial, or perhaps otherwise class-based, invidiously
discriminatory animus [lay] behind the conspirator's action."
506 U.S. 263, 268 (1993) (citing Griffin v. Breckenridge, 403
U.S. 88, 102 (1971)) (internal quotation marks omitted).

   Defendants, however, are arguing about the wrong clause
of the KKK Act in all their submissions. The Supreme Court in

Bray was specifically referring to and analyzing "the first clause of § 1985(3)," i.e., the "Equal Protection Clause."[32] Id. at 267. The Equal Protection Clause does in fact contain a discriminatory or racial animus requirement. However, the clause at issue in the instant case is the second clause[33] of 42 U.S.C. Section 1985(3) -- the Support or Advocacy Clause -- which does not require a showing of racial animus.

As Plaintiffs note in their opposition, Defendants conflate Section 2's Equal Protection Clause with the Support or Advocacy Clause, improperly imposing a requirement of racial animus. That all of the Individual Plaintiffs identify as White is therefore not relevant to the analysis of whether the Support or Advocacy Clause has been violated. The relevant inquiry is whether the right to vote or the right to engage in voting-related activities has been violated. The Court again rejects Defendants' argument that a showing of racial

---

[32] The Equal Protection Clause of Section 2 of the KKK Act states:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws[]

42 U.S.C. § 1985(3).

[33] The Court recognizes that 42 U.S.C. Section 1985(3) is actually comprised of four clauses. Clauses one and two comprise the Equal Protection Clause, and clauses three and four make up the Support or Advocacy Clause. For the purpose of this analysis, the Court will consider Section 1985(3) as being divided into two major clauses.

animus is required, and in the following, examines whether the undisputed facts establish the elements for a violation of the Support or Advocacy Clause, which the Court so finds.

b. Conspiracy

A conspiracy under federal law requires: "(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002). "[P]roof of an explicit agreement" is not required. Cine Sk8, Inc. v. Town of Henrietta, 507 F.3d 778, 792 (2d Cir. 2007) (internal quotation marks and citation omitted). However, "a plaintiff must demonstrate at least that [the] parties have a tacit understanding to carry out the prohibited conduct." Id. (internal quotation marks and citation omitted).

Plaintiffs argue that Defendants knowingly agreed to and engaged in the conspiracy to disseminate the Robocall. Though Defendants do not address whether they engaged in a conspiracy, the undisputed evidence, such as the emails between Defendants and their own admissions, support such a finding. Defendants made plans to create a robocall in order to "HIJACK" the election (Pls. Rule 56.1 Stmt. ¶ 7) and subsequently

decided to publish the call to voters in specific cities with "black neighborhoods" (id. ¶ 14). Further, Defendants actively recruited and paid a voice actress, Hunt, to record the Robocall, hired a telecommunications company, Message, to broadcast the Robocall, and disseminated the call to roughly 85,000 phone numbers across the United States, thereby committing multiple overt acts in furtherance of an agreed-upon conspiracy. The calls were placed from a phone number registered under Burkman's name, and were sponsored and paid for by Burkman Associates. Defendants then celebrated the successful implementation of their plan. Defendants also admitted at the TRO hearing on October 26, 2020, to causing the Robocall to be sent. (See TRO Hearing Tr. at 12:18-13:2, 15:15-21.) They agreed to engage in the voter suppression operation via the Robocall, knowingly engaged in this conspiracy, and took overt steps to effectuate the plan. That Defendants engaged in a conspiracy is clear.

c. Intimidation and Threats

The Court has established that Defendants' conduct constituted voter intimidation and threats in its analysis of Section 11(b) of the VRA. (See supra Section III.C.2.) As the Court previously found, there is no authority suggesting that such terms hold a different meaning under Section 2 of the KKK Act. NCBCP I, 498 F. Supp. 3d at 487-88. Further, unless

legislative intent suggests otherwise, the "whole code canon" compels this Court to interpret the same term consistently across similar statutes. See id. at 481; NCBCP II, 512 F. Supp. 3d at 512. Accordingly, the Court finds that this element has been met.

      d. Target of the Conspiracy

The final element for finding a violation of the Support or Advocacy Clause is that the target of the conspiracy must be an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections. The Court previously held at the TRO stage that the target of the conspiracy orchestrated by Defendants involved those legally entitled to vote and engaging in lawful activity related to voting in federal elections. Now, at the summary judgment stage, based on the undisputed facts in this case, the Court again finds that this element has been satisfied.

Plaintiffs argue that the target of the conspiracy was Black voters, but also reached other eligible and lawfully registered voters, including each of the Individual Plaintiffs. There is no dispute that Defendants' Robocall reached more than 85,000 numbers, including approximately 5,494 in the State of New York alone, no doubt comprised of eligible voters. Each Individual Plaintiff received the Robocall and were all registered voters planning to vote in

the 2020 Election, a federal election. (See Winter Decl. ¶¶ 3, 9; Steinberg Decl. ¶¶ 3, 8; Hart Decl. ¶ 2; Wolff Decl. ¶ 3; Slaven Decl. ¶ 3; Kennedy Decl. ¶ 3; Daniel Decl. ¶ 3; Sferes Decl. ¶ 3.) Further, there is no dispute that voting by mail is a lawful activity related to voting in federal elections. (See, e.g., Kellner Report at 4-5 (describing New York state election laws allowing for vote-by-mail in federal election).) Thus, Plaintiffs have established through the undisputed facts that Defendants violated the Support or Advocacy Clause of the KKK Act. The Court grants summary judgment to Plaintiffs on this claim and denies Defendants' motion on this claim.

4. Section 131(b) of the Civil Rights Act of 1957[34]

Both parties seek summary judgment on the claim that Defendants violated Section 131(b) of the Civil Rights Act of 1957. Section 131(b) states, in relevant part, that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote . . . ." 52 U.S.C. § 10101(b). This provision is largely identical to

---

[34] Sections III.C.4. to III.C.7. are causes of action raised in the Complaint in Intervention filed by the NY AG. (See Complaint in Intervention.)

Section 11(b) of the VRA, with the additional requirement that the intimidation be "for the purpose of interfering with the right to vote." McLeod, 385 F.2d at 739.

Similar to Section 11(b) of the VRA, Section 131(b) of the Civil Rights Act applies to the actions of private persons, as the statute expressly includes those "acting under color of law *or otherwise*," 52 U.S.C. § 10101(b) (emphasis added). Section 131(b) also lacks a racial animus requirement.

The primary difference between Section 131(b) of the Civil Rights Act and Section 11(b) of the VRA is that Section 131(b) requires a showing of intent -- that the intimidation be "*for the purpose of* interfering with the right to vote." McLeod, 385 F.2d at 739 (emphasis added). Plaintiffs point to Defendants' emails that shed light into their private musings, and to Wohl's ACPI Prospectus, as evidence supporting the contention that the purpose of Defendants' intimidation was to interfere with another's right to vote, satisfying the intent requirement.

The Court is persuaded that the undisputed evidence supports finding that the intent element is satisfied. Throughout Defendants' correspondences with one another, it is plain that they sought to disrupt the election. They repeatedly utilize colorful language to describe their Robocall operation, referring to the plan as "HIJACK[ing]"

the election (Pls. Rule 56.1 Stmt. ¶ 7) and describing their actions as an "attack" (id. ¶ 8). The ACPI Prospectus also sheds light on their intentions to suppress Democratic voters. And that they targeted Black voters is made clear through their emails indicating that they planned to target "black neighborhoods" (id. ¶ 14) and the message itself, which used racially coded language to threaten harmful consequences if one voted by mail. (See Hancock Alfaro Report at 3-4.) Further, Defendants drafted the language of the Robocall script, hired a Black voice actress to record the script, coordinated with Mahanian of Message to pay for and launch the Robocall, and celebrated the upset responses they received from Black recipients after the launch.

Defendants' planning, execution, and internal communications demonstrate that they intended to interfere with the right to vote. Accordingly, the Court finds that Plaintiffs are entitled to summary judgment on their Section 131(b) of the Civil Rights Act claim and grants Plaintiffs' motion for summary judgment on that claim.

5. Sections 40-c and 40-d of New York Civil Rights Law

Both parties seek summary judgment in their favor on the claim that Defendants violated Sections 40-c and 40-d of NYCRL. NYCRL Section 40-c is violated when a person is "subjected to any discrimination in his or her civil rights" based on "race,

creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability." N.Y. Civ. Rights Law § 40-c. Section 40-d imposes a penalty on "[a]ny person who shall violate any of the provisions of the foregoing section, . . . or who shall aid or incite the violation" of that section. N.Y. Civ. Rights Law § 40-d.

The right to vote is unequivocally a civil right. See, e.g., Logan v. U.S., 552 U.S. 23, 28 (2007) (noting that courts have held that the right to vote is a civil right); Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."); Williams v. Sclafani, 444 F. Supp. 906, 910 (S.D.N.Y. 1978) ("It is well settled that voting is a fundamental right[.]").

Further, the undisputed evidence in this case establishes that Defendants' conduct in designing and executing the Robocall was racially motivated; the Robocall sought to deter eligible Black voters from exercising their right to vote, subjecting them to discrimination in their civil rights. Plaintiffs identify compelling undisputed evidence, establishing that Defendants targeted the Black community. Plaintiffs point to the fact that Defendants intentionally sought out and hired a Black female voice

actress to read and record the Robocall script, as evidenced by the Los Angeles Craigslist advertisement posted by Wohl. As discussed above, Defendants also emailed one another about sending the Robocall to "black neighborhoods" throughout the country, including New York City. (Pls. Rule 56.1 Stmt. ¶ 14.) When discussing their Robocall strategy, Defendants referred to it as the "black robo" (id. ¶ 17) and used terms like "attack" and "HIJACK" to refer to their operation (id. ¶¶ 7-8).

The Robocall script itself also contained racially coded language and was imbued with numerous harmful racial stereotypes about the Black community in an effort to target Black voters. (See Hancock Alfaro Report at 3-7.) As Plaintiffs' expert, Ange-Marie Hancock Alfaro, Professor of Political Science and International Relations at the University of Southern California, describes, the call used slang "supposedly associated with Black people" (id. at 4), such as "Don't be *finessed* into giving your private information to the *Man*." (Pls. Rule 56.1 Stmt. ¶ 4; Defs. Rule 56.1 Stmt. ¶ 3 (emphasis added).) Further, each of the threatening messages contained in the Robocall also relied on harmful stereotypes of Black people, related to interactions with the criminal justice system, the amassing of debt, and resistance towards medicine. (See Hancock Alfaro Report at 4-

6.) The Court notes that Defendants challenge Hancock Alfaro's contention that the Robocall contained racial stereotypes, but they fail to provide any argument to persuade the Court otherwise. (<u>See</u> Defs. MSJ Brief at 22.) The Court finds that the use of racialized language and reliance on stereotypes were conscious choices and corroborate that Defendants deliberately targeted the Black community to reduce their turnout in the 2020 Election.

Thus, there is little ambiguity that Defendants targeted the Black community for their voter suppression operation.[35] Moreover, if their intention in the lead up to the Robocall launch was not clear, then it is made all-the-more apparent when seeing that upon disseminating the Robocall, Burkman emailed Wohl, expressing his satisfaction that he was receiving "angry black call backs." (Pls. Rule 56.1 Stmt. ¶ 17.)

---

[35] At their depositions, both Defendants asserted their Fifth Amendment right to remain silent when asked if they sent the Robocall and if they targeted Black voters with the call. (<u>See</u> Dkt. No. 216-56 at 163:3-164:8; Dkt. No. 216-57 at 165:16-166:17.) The Court recognizes that it is entitled to accord the adverse inferences drawn from Defendants' invocation of their Fifth Amendment right with "considerable weight" in resolving motions for summary judgment. <u>LiButti v. United States</u>, 178 F.3d 114, 120 (2d Cir. 1999); <u>see also In re 650 Fifth Avenue and Related Properties</u>, 934 F.3d 147, 171 (2d Cir. 2019) ("A witness's Fifth Amendment invocation may be admissible evidence at a civil trial, and courts may instruct juries that they can draw an adverse inference from the invocation."); <u>JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. & Trade Servs., Inc.</u>, 386 F. Supp. 2d 461, 463, 476 (S.D.N.Y. 2005) (granting summary judgment to plaintiffs where Fifth Amendment invocation precluded question of fact). Thus, the Court notes that it may find Defendants' Fifth Amendment invocation probative of their wrongdoings.

Defendants do not provide legal argument in their submissions as to the Section 40-c NYCRL claim. However, in their argument on the KKK Act, Defendants argue that they did not discriminate against anyone based on race on the grounds that all of the Individual Plaintiffs are White, and that the Robocall was disseminated to "randomized telephone numbers within certain designated area codes," which they offer as support that the Robocall "was not targeted toward specific races or ethnicities." (Defs. MSJ Brief at 31.) They further contend that the call was not racially motivated because the neighborhoods that ultimately received the Robocall were "racially diverse, middle-class neighborhoods" and were not "plagued by the same level of racial disenfranchisement that existed in the Deep South in the 1950s or 1960s . . . ." (Id. at 32.)

The Court is not persuaded by Defendants' argument. The evidence establishes that the neighborhoods that Defendants targeted were not accidental or random. Coupled with Wohl's ACPI Prospectus outlining how he planned to infiltrate the Democratic vote, Defendants deliberately chose "black neighborhoods" when developing their strategy and designing their voter suppression project via the Robocall. The Court is hard-pressed to find an alternative theory as to why they did so besides to deny the right to vote specifically to Black

voters, and a reasonable jury likewise would not be able to find otherwise.

The Court thus finds that Defendants subjected the Black community to discrimination in their civil rights based on race in violation of Sections 40-c and 40-d of the New York Civil Rights Law. Accordingly, the Court grants Plaintiffs' motion for summary judgment as to this claim.

6. <u>Section 9 of New York Civil Rights Law</u>

NYCRL Section 9 aims to protect elections against efforts to interfere with an individual's right to vote. Section 9 states that "All elections ought to be free; and no person by force of arms, malice, menacing, or otherwise, should presume to disturb or hinder any citizen of this state in the free exercise of the right of suffrage." N.Y. Civ. Rights Law § 9.

Plaintiffs argue that Defendants violated this statute by designing and executing a voter suppression effort in which they "falsely suggest[ed] that those who voted by mail could be incarcerated, hounded by debt collectors, and forcibly vaccinated for doing so." (Pls. MSJ Brief at 24.) This effort evinced that Defendants intended to "disturb or hinder" the "free exercise of the right of suffrage" of New York residents. Further, Plaintiffs contend that vote-by-mail was part of an intentional and concerted effort of the State of New York to

administer a free and fair election at the height of the COVID-19 pandemic. (See Pls. MSJ Brief at 4.) Essentially, by strategizing and implementing a plan to discourage vote-by-mail among voters in New York, particularly Black voters, Defendants infringed upon the "free exercise of the right of suffrage," violating this state statute.

In both their summary judgment brief and their opposition brief, Defendants fail to provide any argument that they did not violate NYCRL Section 9. They merely assert that Defendants did not intimidate or intend to intimidate anyone to suppress votes. (See Defs. MSJ Brief at 34; Defs. MSJ Opp. at 21.)

Section 9 applies to private actors, for it provides that "no person" may engage in the conduct proscribed by the statute.[36] That the phrase "no person" applies to private individuals has been upheld in analogous contexts in both New York and federal courts, including this Court. See, e.g., Salonen v. Barbella, 409 N.Y.S.2d 759 (App. Div. 1978)

---

[36] The amicus brief filed by the NYCLU provides helpful guidance in interpreting the statute. Section 9 was adopted in New York in 1787 as part of the state's original Bill of Rights. Listed as the ninth guarantee, the provision in full stated "[t]hat all elections shall be free, and that no person, by force of arms nor by malice or menacing or otherwise, presume to disturb or hinder any citizen of this state to make free election, upon pain of fine and imprisonment and treble damages to the party grieved." Charles Z. Lincoln, The Constitutional History of New York, Volume I, 1609-1822 730 (1906). And the provision has roots in the English Bill of Rights, which provided for the free election of members of the Parliament. See id.; (see Pls. MSJ Brief at 23-24; NYCLU Amicus at 2, 7.)

(applying NYCRL Section 40-c to a private individual in the voter interference context); <u>People v. Dieppa</u>, 601 N.Y.S.2d 786, 790 (N.Y. Sup. Ct. 1993) (finding private individual violated NYCRL Section 40-c); <u>LULAC</u>, 2018 WL 3848404, at *3 (finding that "no person" language of Section 11(b) of VRA applies to private conduct); <u>NCBCP I</u>, 498 F. Supp. 3d at 476 (same). Thus, Defendants, as private actors, possess the legal ability to violate Section 9.

The Court turns to the plain text of the statute to examine the precise conduct that Section 9 proscribes. <u>See</u> <u>U.S. v. Gayle</u>, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text . . . ."). Specifically, the statute prohibits any person from interfering with the free exercise of the right to vote "by force of arms, malice, menacing or otherwise" N.Y. Civ. Rights Law § 9. In determining what constitutes "malice," the Court looks to the dictionary definition. Noah Webster's An American Dictionary of the English Language defines "malice" as "extreme enmity of heart, or malevolence;" "a disposition to injure others without cause, from mere personal gratification or from a spirit of revenge;" or "unprovoked malignity or spite." Noah Webster, An American Dictionary of

the English Language, Volume II 98 (1828).[37] The more recent Collegiate Dictionary defines malice as "desire to cause pain, injury, or distress to another" or "intent to commit an unlawful act or cause harm without legal justification or excuse." Merriam Webster's Collegiate Dictionary 704 (10th ed. 1993). "Menace" means "to threaten;" "to express or show a disposition or determination to inflict punishment or other evil;" "to show or manifest the probability of future evil or danger to;" or "to exhibit the appearance of any catastrophe to come." Noah Webster, An American Dictionary of the English Language 125 (1828). Webster's Collegiate Dictionary defines "menace" as "to make a show of intention to harm" or "to represent or pose a threat to." Merriam Webster's Collegiate Dictionary 725 (10th ed. 1993). These definitions of malice and menace overlap largely with the definitions of intimidation, threat, and coercion that the Court discussed above.

The Court finds that the undisputed facts here establish that Defendants violated Section 9 of New York Civil Rights Law. As the Court explained in its analysis of the VRA and the Civil Rights Act, Defendants acted intentionally in

---

[37] NYCRL Section 9 was amended in 1829 to protect "any citizen of this state in the free exercise of suffrage." (NYCLU Amicus at 7 (citing N.Y. Rev. Stat. Chap. IV § 4 at 94 (1829)).)

intimidating voters with the Robocall by making threats of legal, economic, and physical harm. That Defendants deliberately sought to injure others or cause distress in the recipients of the Robocall to make them fearful of voting by mail is evident through the emails exchanged between Defendants in which they describe the Robocall strategy as an attack on or hijacking of the election, and rejoice at receiving "angry black call backs," concluding that their strategy was "a great jw idea." (Pls. Rule 56.1 Stmt. ¶ 17); see also Washington v. Davis, 426 U.S. 229, 253 (1976) (Stevens, J. concurring) (noting that "normally[,] the actor is presumed to have intended the natural consequences of his deeds"). Their actions easily fall within the parameters of "menace" and "malice" as defined above.

Section 9 proscribes certain interference with "the free exercise of the right of suffrage." While the New York Constitution does not expressly include absentee voting as a constitutional right, see Colaneri v. McNab, 395 N.Y.S.2d 980, 983 (N.Y. Sup. Ct. 1975), the "free exercise of the right of suffrage" can reasonably be interpreted as the right to vote in all the ways permitted by law, without undue interference or obstruction, including vote by mail, which is reflected in

the New York Constitution.[38] Likewise, New York courts have recognized the broad scope of the right to vote.[39]

During the COVID-19 pandemic, New York, through the State Board of Election, sought to adopt several precautionary measures to expand voters' access to the ballot in the 2020 Election in response to legitimate concerns about the risk of contracting COVID-19 if voting in person. (See Kellner Report at 4; Pls. Rule 56.1 Stmt. ¶ 29.) Under New York election law, absentee voting was primarily "available upon application to voters who by reason of disability, caretaking responsibilities, illness, absence, or being detained in jail cannot vote in person at the polling place." (Kellner Report at 4.) However, on April 9, 2020, the New York Governor expanded absentee ballots to all eligible

---

[38] The New York State Constitution, read together with NYCRL Section 9, intimates that the state has an expansive conception of the free exercise of suffrage, which includes absentee voting, see N.Y. Const. art. II, § 2, in addition to the secret ballot, see id. at art. II, § 7; In re Hearst, 76 N.E. 28, 29 (N.Y. 1905), and voter identification by signature, see N.Y. Const. art. II, § 7. (See NYCLU Amicus at 7.)

[39] See, e.g., Hopper v. Britt, 96 N.E. 371, 373 (N.Y. 1911) (determining that the guarantee of the State Constitution implies "that every elector shall have the right to cast his vote with equal facility to that afforded to other voters, or, to speak more accurately, without unnecessary discrimination against him as to the manner of casting his vote"); In re Barber, 263 N.Y.S.2d 599, 600-01 (App. Div. 1965) (finding that the constitutional guarantee of the right to vote "includes the right to participate in the several methods established by law for the selection of candidates to be voted for") (internal quotation marks and citation omitted); St. John v. Bd. Of Elections of Cnty. of Albany, 546 N.Y.S.2d 301, 303 (N.Y. Sup. Ct. 1989) ("The right to vote, either in person or by absentee ballot, is one of a citizen's most hallowed rights."); see also Colaneri, 395 N.Y.S.2d at 983 (noting that "Section 2, Article II of the New York State Constitution empowers the legislature to provide for absentee ballots").

voters due to concerns regarding contracting COVID-19. (Id. at 4-5.) Then, on April 24, 2020, the Governor issued an executive order requiring all local Board of Elections to mail absentee ballot applications to all eligible voters. (Id.) Within this context of New York expanding vote-by-mail to all New York voters during the pandemic, it is clear that intruding upon a person's ability to vote by mail would constitute interference with "the free exercise of the right of suffrage" as guaranteed by Section 9.

Next, the Court finds that Defendants "presume[d] to disturb or hinder" New York voters "in the free exercise of the right of suffrage." N.Y. Civ. R. Law § 9. This is evident from the email exchanges between Defendants, in their ACPI Prospectus, and in their public admissions in seeking to suppress turnout, as discussed above. Defendants created and disseminated threatening messages to stop Black voters in New York from voting by mail in an effort to essentially prevent them from participating in the election. This effort sought to obstruct and cause delay in the ability of these voters to exercise their right to vote, amounting to a hinderance or a disturbance of the free exercise of the right of suffrage.

Lastly, the statute protects "any citizen of this state in the free exercise of the right of suffrage;" that is, it protects all eligible voters, regardless of race or other

protected characteristic, in the State of New York in exercising their right to vote. Id. Here, the Robocall in question reached nearly 5,494 phone numbers with New York area codes (Pls. Rule 56.1 Stmt. ¶ 2), including New York residents who were registered to vote and planned to vote by mail. Among the Individual Plaintiffs, Winter, Steinberg, Sferes, and Wolff were residents of and registered to vote in the State of New York at the time they received the Robocall. (Id. ¶¶ 19-20, 22, 25.) Thus, Defendants' conduct violated the rights of New York voters, including these Individual Plaintiffs, in their exercise of their voting rights.

Accordingly, the Court is persuaded that Defendants violated NYCRL Section 9. The Court finds that Plaintiffs are entitled to summary judgment on this claim, and Defendants' motion on this claim is denied.

7. Section 63(12) of New York Executive Law

NYEL Section 63(12) authorizes the Attorney General to enjoin "any person" who "engage[s] in repeated fraudulent or illegal acts or otherwise demonstrate[s] persistent fraud or illegality in the carrying on, conducting or transaction of business." N.Y. Exec. Law § 63(12). Section 63(12) provides further guidance on interpreting the terms used in the statute:

> The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment,

suppression, false pretense, false promise or unconscionable contractual provisions. The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct. The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person.

Id. Under NYEL Section 63(12), "[a]ny conduct which violates state or federal law is actionable . . . ." FTC v. Shkreli, 581 F. Supp. 3d 579, 627-28 (S.D.N.Y. 2022) (internal quotation marks and citation omitted). Moreover, Section 63(12) broadly applies "to all business activity accompanied by repeated acts of illegality." New York v. Feldman, 210 F. Supp. 2d 294, 300 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).

The NY AG argues that Defendants acted through Burkman's business, the lobbying firm Burkman Associates, to engage in repeated illegality in violation of Section 63(12). (See Pls. MSJ Brief at 25.) As with the other state law claims, Defendants fail to meaningfully rebut Plaintiffs' argument on the Section 63(12) claim.

The Court is persuaded that the undisputed facts in evidence prove the NY AG's contention that Defendants are liable under Section 63(12) of the NYEL. The facts demonstrate that Burkman Associates was the business entity used to purchase the Robocall service from Message and transmit the

Robocall that is the subject of this litigation. Financial transactions were made between Burkman Associates and Message, and emails were exchanged between Burkman and Mahanian to effectuate the operation. The voting-related message that was broadcasted through the Robocall was consistent with the purpose and types of activities that a lobbying firm like Burkman Associates would carry out, and there is no evidence in the record to suggest that this activity was not part of the carrying out of the business.

Further, as the Court discussed above, Defendants, through the Robocall operation, engaged in illegal activity by violating both federal and state law, including the VRA, the KKK Act, the Civil Rights Act, and Sections 9 and 40-c of the NYCRL. This illegal activity was "repeated" because it "affect[ed] more than one person," N.Y. Exec. Law § 63(12), reaching at least 85,000 phone numbers across the country, including 5,494 New York phone numbers. Among the Individual Plaintiffs, four resided in New York at the time that the Robocall was broadcasted. On this ground alone, the NY AG has established that Defendants violated NYEL Section 63(12).

However, the NY AG also argues that Defendants' conduct rose to the level of fraud, also in violation of Section 63(12). Under the NYEL, fraud includes "any device, scheme or artifice to defraud and any deception, misrepresentation,

concealment, suppression, false pretense, false promise or unconscionable contractual provisions." N.Y. Exec. Law § 63(12). There is no dispute that Defendants misrepresented the consequences of voting by mail in the Robocall by falsely claiming that law enforcement, debt collectors, and the CDC will use the voter's information acquired through vote-by-mail records to track down old warrants, collect outstanding debts, and track for mandatory vaccinations. As the Court has established, this misrepresentation was perpetrated to dissuade Black voters from voting in the 2020 Election. Indeed, even in jurisdictions outside of New York, Defendants were charged with engaging in fraud. On October 24, 2022, in Ohio, Defendants pled guilty to one count of telecommunications fraud (see Dkt. No. 252-1 at 14:20-15:3), which the Court takes into account in assessing this claim.

Finally, the fraudulent activity was repeated as Defendants' conduct affected more than one person -- roughly 5,494 New York phone numbers -- and it was carried out by the business Burkman Associates. The facts thus establish that Defendants violated Section 63(12) by also engaging in repeated fraudulent activity in carrying out their business. Accordingly, the NY AG's motion for summary judgment on the Section 63(12) claim is granted, and Defendants' cross motion on this claim is denied.

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 219) of plaintiffs National Coalition on Black Civic Participation, Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, Andrea Sferes, and Letitia James, Attorney General of the State of New York (collectively, "Plaintiffs") to strike the report of expert witness Charles Ribando, offered by defendants Jacob Wohl, Jack Burkman, J.M. Burkman & Associates, LLC, Project 1599, and John and Jane Does 1 through 10 (collectively, "Defendants") is **GRANTED**, in part, and **DENIED**, in part; and it is further

**ORDERED** that the motion (Dkt. No. 239) of Plaintiffs to strike Defendants' Rule 56.1 Statement of Undisputed Facts is **GRANTED**, in part, and **DENIED**, in part; and it is further

**ORDERED** that the motion (Dkt. No. 208) of Defendants for summary judgment on the claims brought by Plaintiffs in this action is **DENIED**; and it is further

**ORDERED** that the joint motion (Dkt. No. 212) of Plaintiffs for summary judgment as to liability on all claims is **GRANTED**. As the action remains pending with respect to the scope of relief sought against Defendants, including damages, attorney's fees, and costs, Plaintiffs shall file a joint letter on the prospective relief sought no later than twenty

(20) days from the date of this Order. Defendants shall have ten (10) days to file a response. Plaintiffs may have an additional seven (7) days from the date of Defendants' submission to file a reply. The Clerk of Court is respectfully directed to terminate any pending motions.


**SO ORDERED.**

Dated:    8 March 2023
             New York, New York

                                    Victor Marrero
                                      U.S.D.J.